Shelley SAVAGE, Plaintiff–Appellee,

v.

**GLENDALE UNION HIGH SCHOOL, District No. 205, Maricopa County, Defendant–Appellant.**

No. 02–15743.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 12, 2003.

Filed Sept. 10, 2003.

Steven Plitt and Karla Starr; Shugart Thompson Kilroy Goodwin Raup, P.C.; Phoenix, AZ; attorneys for the appellants.

Rose Daly–Rooney; Tucson, AZ; attorney for the appellee.

Jill K. Osborne; Kerrin & Osborne, P.C.; Phoenix, AZ; attorneys for Amicus Curiae Arizona Education Association.

Anne Marie R. Segal; White & Case LLP; New York, NY; and Dan Woods; White & Case LLP; Los Angeles, CA; attorneys for Amicus Curiae National Association of Protection and Advocacy Systems.

Before: BEEZER, THOMAS, and CLIFTON, Circuit Judges.

THOMAS, Circuit Judge.

This appeal presents the question of whether an Arizona high school district is an arm of the state entitled to Eleventh Amendment immunity from suit in federal court for alleged violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 & 12203 *et seq.*, and the Rehabilitation Act ("RA"), 29 U.S.C. § 794 *et seq.* We hold that it is not, and affirm the district court.

I

■ This case arises out of the termination of plaintiff Shelley Savage's employment relationship with defendant Glendale Union High School District ("the School District").[1] Shelley Savage, a disabled individual, was employed by the School District at Independence High School as an education services technician. The management at the high school informed Savage that she must affix a flagpole to her wheelchair in order to make herself more visible to students in the classroom. She objected to the request, informing the management staff she believed it to be discriminatory. Nevertheless, they continued to require that she comply. When Savage refused to put the flag and flagpole on her wheelchair, the School District ter-

minated her employment. Savage subsequently filed a discrimination charge with the United States Equal Employment Opportunity Commission ("EEOC") and the Arizona Civil Rights Section of the Attorney General's office. The EEOC issued a determination letter, finding reasonable cause to believe that the School District had discriminated against Savage by subjecting her to discriminatory terms and conditions of employment, and then discharging her in retaliation for her opposition to the discriminatory terms. The EEOC then issued Savage a right to sue letter. Savage also received a right to sue letter from the Arizona Civil Rights Section of the Attorney General's office.

Savage filed suit in the United States District Court for the District of Arizona, claiming violations of Title I of the ADA, 42 U.S.C. §§ 12101 *et seq.*, 42 U.S.C. § 12203, Section 504 of the RA, 29 U.S.C. § 794, and the Arizona Civil Rights Act ("ACRA"), Ariz.Rev.Stat. §§ 41–1461 *et seq.* Savage seeks injunctive, compensatory and punitive relief.

■ The School District filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), arguing that Savage's claims under the ADA and RA are barred by the Eleventh Amendment because the School District is an arm of the state. The School District further argued that if the ADA claims and RA claims are dismissed, then the district court could not exercise supplemental jurisdiction over the ACRA claims. Both parties supplied affidavits and public documents in support of their positions regarding the motion to dismiss.[2]

---

1. Savage and the School District offer differing accounts of the circumstances surrounding her termination. However, because this case was considered by the district court under a Rule 12(b)(1) motion to dismiss, we assume the material facts alleged in the complaint are true. *See Orsay v. United States*

*Dep't of Justice*, 289 F.3d 1125, 1127 (9th Cir.2002). Thus, the account of Savage's termination is drawn from her complaint.

2. In evaluating the Rule 12(b)(1) motion to dismiss, the district court considered affidavits furnished by both parties. This is proper

After reviewing the arguments and documentation and applying the five part test set out in *Mitchell v. Los Angeles Community College District*, 861 F.2d 198, 201 (9th Cir.1988), the district court concluded that the School District was not an arm of the state and therefore not entitled to sovereign immunity under the Eleventh Amendment. Because the district court determined that it had jurisdiction over the ADA and RA claims, it concluded that the exercise of jurisdiction over the ACRA claims was a proper exercise of supplemental jurisdiction and declined to dismiss them. This appeal followed.

## II

■■■ Whether a state has sovereign immunity under the Eleventh Amendment presents questions of law which we review de novo. *Carey v. Nevada Gaming Control Bd.*, 279 F.3d 873, 877 (9th Cir.2002). The existence of subject matter jurisdiction is a question of law which we also review de novo. *United States v. Peninsula Communications, Inc.*, 287 F.3d 832, 836 (9th Cir.2002). The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1367(a). Although the denial of a motion to dismiss is ordinarily not a complete and final judgment subject to appeal, entities that claim to be arms of the State may use the collateral order doctrine to appeal a district court order denying a claim of Eleventh Amendment immunity. *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993). Accordingly, we have jurisdiction pursuant to 28 U.S.C. § 1291.

## III

■■■ It is well established that agencies of the state are immune under the Eleventh Amendment from private damages or suits for injunctive relief brought in federal court. *See, e.g., Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). However, while States are protected by the Eleventh Amendment from suit in federal court, local governments do not enjoy this immunity. *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 369, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); *Lincoln County v. Luning*, 133 U.S. 529, 530, 10 S.Ct. 363, 33 L.Ed. 766 (1890). Because Congress may not abrogate the sovereign immunity of states for suits under Title I of the ADA, Savage may not bring her ADA claims against the School District in federal court if the School District is an arm of the state rather than the local government, as the School District contends. *See Garrett*, 531 U.S. at 360, 121 S.Ct. 955. We conclude that the School District does not fall under the protection of the Eleventh Amendment.

■■■ To determine whether a governmental entity is an arm of the state for Eleventh Amendment purposes, we examine the following factors: (1) whether a money judgment would be satisfied out of state funds; (2) whether the entity performs central governmental functions; (3) whether the entity may sue or be sued; (4) whether the entity has the power to take property in its own name or only in the name of the state; and (5) the corporate status of the entity. *Mitchell v. Los Ange-*

because Rule 12(b)(1) attacks on jurisdiction can be either facial, confining the inquiry to allegations in the complaint, or factual, permitting the court to look beyond the complaint. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir.2000). Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction. *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir.1989).

*les Cmty. Coll. Dist.,* 861 F.2d 198, 201 (9th Cir.1988). In making this determination, a court examines the manner in which state law treats the entity. *Id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Applying these factors in examining the unique features of California law as it existed at the time, we determined in *Belanger v. Madera Unified School District,* 963 F.2d 248 (9th Cir. 1992), that California school districts are state agencies entitled to Eleventh Amendment immunity. On the other hand, in *Eason v. Clark County School District,* 303 F.3d 1137 (9th Cir.2002), we applied the *Mitchell* factors and concluded that Nevada school districts are not arms of the state entitled to sovereign immunity. A careful examination of the Arizona statutory scheme demonstrates that Arizona's school districts are more akin to Nevada's than California's and therefore are subject to suit in federal court.

### A

■■■ Because the impetus of the Eleventh Amendment is the prevention of federal-court judgments that must be paid out of a state's treasury, "[t]he vulnerability of the State's purse [is] the most salient factor in Eleventh Amendment determinations." *Hess v. Port Auth. Trans–Hudson Corp.,* 513 U.S. 30, 48, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994). Accordingly, the first *Mitchell* factor is the most important component in establishing Eleventh Amendment immunity. *Belanger,* 963 F.2d at 251. After a careful review of the tendered evidence and relevant statutes, the district court concluded that the state of Arizona is not responsible for any money judgment awarded against the School District.

A close examination of Arizona's school funding structure demonstrates that the district court was correct in concluding that the Arizona State treasury would not be vulnerable to a money judgment against the School District. As the district court noted, school districts in Arizona are supported by federal, state and local funds. Federal money is acquired mainly in the form of grants, some of which are paid to the states and then dispersed to individual school districts, others of which are provided directly by the federal government to county treasurers for use by school districts. Ariz.Rev.Stat. §§ 15–206–15–209. The state provides grants for qualifying school districts, and also dispenses state monies in the form of state equalization assistance. Ariz.Rev.Stat. § 15–971. Local monies may come from county assistance and local property taxes. Ariz.Rev. Stat. § 15–971. School districts are also permitted by statute to raise money through bonded indebtedness. Ariz.Rev. Stat. §§ 15–1021 to 15–1032. All these federal, state and local monies go into the maintenance and operations fund ("M & O fund") maintained by the county treasurer. Ariz.Rev.Stat. § 15–996. State and federal grant money must be used only for the purposes for which the grants are awarded. Ariz.Rev.Stat. § 15–210. But other monies in a school district's M & O fund may be used for all the school district's operating expenses, including legal fees, liability insurance, and money judgments.

■■ The School District argues that it is this commingling of funds that renders it an arm of the state, since state monies may be spent on money judgments. Yet as the district court observed, if mere commingling were enough to bestow governmental agency status upon the School District, then it would also be an arm of the federal government, as well as an arm of the Maricopa County, which contributed $2.3 million to the School District in 1999–2000. Because counties are not arms of the state entitled to Eleventh Amendment immunity, *see Mt. Healthy,* 429 U.S. at

280, 97 S.Ct. 568, by its own commingling argument the School District would be simultaneously entitled to immunity as an arm of the state, and not entitled as a part of the county. Although *Belanger* noted that state and local funds were "hopelessly commingled" in support of its finding that the state would be liable for judgments against California school districts, this was in response to the argument that because some local funds were present in the school district accounts, judgments against the district might have been paid with those rather than state funds. 963 F.2d at 252 n. 3. There, we determined that because the state controlled the budget and would be required to make up any budgetary shortfalls encountered by the district, the commingling of funds indicated the state treasury would be vulnerable to a money judgment. *Id.* at 252. Despite the School District's contention, it was not commingling per se that created that vulnerability, but rather the state's unconditional legal obligation to make up a shortfall.

Although the School District argues that the state would be required to make up a deficiency caused by payment of a money judgment, this is not so. State grant monies contained in the M & O fund can only be used for the purposes for which the grants were awarded. Ariz.Rev.Stat. § 15–210. It is true that other monies in the fund, including state equalization funds, would be vulnerable to a money judgment. However, state equalization assistance is determined based on a strict statutory formula, designed to guarantee a minimum level of support for each school district. *See* Ariz.Rev.Stat. § 15–971. Once the base level of funding for a district is determined, the state subtracts the amount of anticipated property taxes the school district is expected to contribute. The amount remaining, if any, is the amount of equalization assistance provided by the state. *Id.* The state will not provide additional assistance for unexpected operating expenses. *See Roosevelt Elementary Sch. Dist. Number 66 v. Bishop,* 179 Ariz. 233, 877 P.2d 806, 810 (1994) (noting that the per-pupil amount reached by the strict formula for state equalization assistance was determined by multiplying the number of students in a district by a state-wide dollar amount per pupil, resulting in a sum that appears "unrelated to any amount necessary for basic education"). If a school district spends all of its cash in the M & O fund before the end of the fiscal year, it will not receive additional equalization assistance from the state; the state will not provide additional equalization funds to fund the amount of legal fees or a judgment that exceeds a local school district's budget. Nor will the balance revert to the state if the funds are not spent by the end of the year.

The School District asserts that the situation here is analogous to that in *Belanger,* wherein we determined that money judgments against the school districts would be paid by state funds. In *Belanger,* we focused on the fact that California has a strict per-pupil funding limit which prevents wealthy districts from raising too much local revenue, thus serving to equalize school district budgets throughout the state. 963 F.2d at 251. Although state funds were supplemented by local monies, the funds are "hopelessly commingled" in a single fund under state control; any local tax revenue lost to a money judgment would then have to be supplemented by interchangeable state funds already in the district budget. *Id.* at 252. Significantly, at the time, California school districts had budgets controlled and funded by the state government rather than by local school districts. *Id.* at 251. The School District claims that state and local funds are commingled in Arizona school districts operating budgets and the state would be required to make up a budget shortfall

caused by any money judgments against a school district. Consequently, it argues that the district court erred in determining money paid to Savage would not come from the state treasury. In support, the School District points to language in *Roosevelt* explaining that "[i]f a district's requirement contribution falls short of the predetermined base level, the state makes up the difference," 877 P.2d at 810, as evidence that the state of Arizona, like California, will be responsible for budget shortfalls caused by money judgments. However, *Roosevelt* made this observation in the course of discussing the equalization formula: if the district's contribution of revenue from property taxes falls short, then the state would make up the difference to achieve the base level for the district. But, as the Arizona Supreme Court observed, this had nothing to do with the actual expenditures encountered by the school district; rather, it involved the advance determination of equalization funding a school district would receive, based on its property tax base. *Id.*

In contrast, Arizona has a statutory mechanism for dealing with unexpected legal expenses which cause a school district to exceed its budget. Ariz.Rev.Stat. § 15–907 provides that "[i]n the event of excessive and unexpected legal expenses ... the governing board of the school district may petition the county superintendent ... requesting authority to incur liabilities in excess of the school district budget, in an amount the governing board deems necessary." Notably, the statute provides that such excess liability "shall not be included in the computation of additional state aid for education." Ariz.Rev.Stat. § 15–907(E). Thus, the state treasury is shielded from the liability and the excess revenue raised to cover the liability will not be counted against the school district's contribution when state aid is calculated; therefore, the state's expected contribution to the school district would remain the same,

regardless of the payout of money judgments. The school district may also seek additional funds through voter override elections authorizing an increase in property taxes beyond the state-mandated level. Ariz.Rev.Stat. § 15–481.

Amici Arizona School Boards Association and National School Boards Association argue that in the wake of *Roosevelt,* the Arizona school financing system has been overhauled so that it now more closely resembles the California system deemed an arm of the state in *Belanger.* Specifically, they contend that many state controls and funding caps have been instituted in order to comply with the state constitutional mandate to fund the state school system in a "general and uniform manner" such that the school system is now essentially run by the state, and "money judgments against local school districts now necessarily impact the state treasury." They then detail a list of statutes providing for state control and funding of school district capital expenditures, and providing maximum per-pupil limits. However, upon closer examination, their arguments do not alter our conclusion.

As the district court noted, following *Roosevelt,* the state has made changes to the capital financing scheme for state schools by creating the state legislative package known as "Students First." This legislation creates separate funds to address the disparity in the quality of physical facilities among Arizona's local school districts. These are: the New School Facilities Fund, the Building Renewal Fund, and the Deficiencies Correction Fund. In addition, the state created the Soft Capital Fund to permit school districts to purchase short term capital items such as textbooks, equipment, and software. These funds are subject to strict state control and, as the district court properly observed, should be characterized as state funds for the pur-

poses of Eleventh Amendment analysis. Yet these funds are not vulnerable to a money judgment against the school because they can only be used for the capital expenditure purposes prescribed by the state. Ariz.Rev.Stat. § 15–2041(H). Schools may not use these funds for other debts or expenses such as money judgments.

■■■ Aside from these changes in the funding for capital expenditures, the public school financing in Arizona is handled as it was prior to *Roosevelt.* Further, unlike California's constitution, Article IX of the Arizona constitution "does not forbid a financing system that allows districts to seek local sources of revenue, such as property taxation, to surpass the state standards." *Hull v. Albrecht,* 192 Ariz. 34, 960 P.2d 634, 637 (1998) (*Albrecht II* ); *see also Hull v. Albrecht,* 190 Ariz. 520, 950 P.2d 1141, 1145–46 (1997) (*Albrect I* ) ("If a statewide property tax generated capital facilities that met the constitutional standard of general and uniform . . . then districts could be empowered to go above and beyond that without running afoul of the constitution."). Therefore, the M & O funds that would be used to pay a money judgment to Savage are not subject to state control, are not subject to a *Belanger*-style spending-cap, and will not be replenished with money out of the state treasury.[3]

Thus, the district court correctly concluded that this first factor in the *Mitchell* analysis indicates that the School District is not an arm of the state for Eleventh Amendment purposes. *Cf. Eason,* 303 F.3d at 1143 (finding that the state treasury is not vulnerable to a money judgment in Nevada as it would be in California because the state guarantees only a minimum amount of per pupil spending, not a maximum, and school districts may generate funds in addition to those provided by the state).

## B

■■■ The second *Mitchell* factor we consider is whether the entity performs central government functions. In analyzing this factor, we assess the extent to which the state exercises centralized governmental control over the entity, in this case, the public education system. *See Belanger,* 963 F.2d at 253 (noting that California had assumed total control over the funding of public schools and "exercises substantial centralized control over other public school decisions.").

Arizona law, like the law of most states, grants local school districts enormous autonomy in the management of public education. School boards are required to (1) manage and control school property in the district, *see* Ariz.Rev.Stat. § 15–341(A)(4); (2) set curricula; *see* Ariz.Rev.Stat. § 15–341(A)(6); (3) establish criteria for high

---

**3.** In support of their argument that state controls and spending caps are analogous to California's, the school boards amici point to Ariz.Rev.Stat. § 15–905, which provides that "no expenditure shall be made and no debt, obligation, or liability shall be incurred . . . in the budget in excess of the amount specified for that item." However, the statute continues "except as provided in § 15–907." As noted previously, § 15–907 provides the mechanism by which liabilities which exceed the budget may be funded with county funds or voter-approved property tax increases.

Therefore, unlike California, Arizona has a means by which money judgments against the district may be funded exclusively with local funds. In addition, Arizona provides for voter override of the state-mandated property tax cap. *See* Ariz.Rev.Stat. § 15–481. By contrast, we found in *Belanger* that the *lack* of a mechanism for voter override of property tax caps was *significant when determining that* the state, rather than the local school district, would be responsible for a money judgment against the school district. 963 F.2d at 251.

school graduation; *see* Ariz.Rev.Stat. § 15–701.01(B)(2); (4) select either a year-round or traditional school calendar; *see* Ariz.Rev.Stat. § 15–341(A)(2); (5) construct school property, with voter approval; *see* Ariz.Rev.Stat. § 15–341(a)(8); and (6) furnish, repair and insure school property; *see* Ariz.Rev.Stat. § 15–341(A)(7). School boards are also given wide discretion in management of school districts. As we have discussed, Arizona differs from California in that local school districts may raise funds beyond what they receive from the state, and seek voter approval to override state property tax limits.

However, the amici school boards associations point out that the State Board of Education sets statewide standards that the local school boards must implement, arguing that this demonstrates state governmental control. For example, the state board sets uniform statewide courses of study and competency requirements for promotion and graduation of students and controls certification of teachers, Ariz.Rev. Stat. § 15–203; § 15–701; § 15–701.01, approves standardized tests, § 15–741, and prescribes criteria for determining students' English proficiency. Ariz.Rev.Stat. § 15–756. The amici further argue that Arizona defines on a state-wide basis attendance requirements, circumstances when students may be expelled, and procedures for student discipline.

However, if prescribing minimum standards were the measure of a "central government function," then school districts would doubtless be considered an arm of the federal government, as well, by virtue of such statutes as the No Child Left Behind Act of 2001, Pub.L. 107–110, 115 Stat. 1425, 20 U.S.C.A. § 7231. A closer examination of the statutes cited by the amici reveals that substantial discretion is given to the school board in each of these areas. For example, while the state mandates the contours of the school year,

school month, and holidays, § 15–801, school districts retain discretion to decide whether to appoint an attendance officer, § 15–804, (who would be paid out of school district rather than state funds, § 15–805) and to adopt their own policies regarding excuse of pupils from school attendance for religious purposes. § 15–806. The provision for the expulsion of unruly students gives substantial discretion to the School Districts concerning whether or not to expel or readmit a student, whether to admit a student expelled by another educational institution, or whether to reassign a student to an alternative educational program. Ariz.Rev.Stat. § 15–841. The state only mandates that students "shall" be expelled in a few exceptional cases, such as bringing a firearm to school or when the student has been determined to be a threat. *Id.* And the statute prescribing procedures for student discipline provides that "[t]he governing board of any school district shall, in consultation with the teachers and parents of the School District, prescribe rules for the discipline, suspension and expulsion of students," provided those rules follow state procedural guidelines. Ariz.Rev.Stat. § 15–843.

Additionally, the state grants school districts power to "[p]rescribe and enforce policies and procedures for the governance of the schools" provided they are consistent with state law. Ariz.Rev.Stat. § 15–341(A)(1). For example, local districts can manage and control school property in the district, § 15–341(A)(4), acquire books, supplies and furniture, § 15–341(A)(5), make conveyances of school property, § 15–341(A)(9), prescribe curricula and criteria for promotion and graduation provided it meets state guidelines § 15–341(A)(6), and select textbooks and supplemental textbooks for common schools and high schools. Ariz.Rev.Stat. §§ 15–721 & 15–722.

This system of delegation is more weighted towards localized control than the anomalous centralized California system described in *Belanger*. For example, in *Belanger* we found it significant that the state rather than the local school board exercised control over the textbooks used in public schools. 963 F.2d at 253; *See also* Cal. Educ.Code § 51510 (prohibiting local school boards from disallowing the use of textbooks that have been approved by the state board of education). We also observed that the state government dictated when students may be expelled or suspended. *Belanger*, 963 F.2d at 253. In contrast, while the Arizona state government provides for the expulsion of students, it grants substantially more leeway to local districts than does the corresponding California statute. *Compare* Ariz.Rev. Stat. § 15–841(B) ("A school district may expel pupils for actions other than those listed in this subsection as the school district deems appropriate"), *with* Cal. Educ. Code. § 48900 ("A pupil shall not be suspended from school or recommended for expulsion unless the superintendent or the principal of the school in which the pupil is enrolled determines that the pupil has: [list of qualifying offenses follows]."). Thus, in general, the Arizona public school system is not subject to centralized state control to the same extent as California's, and is therefore not performing a centralized governmental function.

The School District also argues that the Arizona Enabling Act establishes the public school system as a central function of the state government. However, this argument is unavailing. The Enabling Act, which conditioned Arizona's and New Mexico's admission to the Union in 1910, provided for the grant of lands to the states by the federal government for the support of the common schools. *See* Enabling Act, §§ 24–26, 36 U.S. Stat. 557, 568–579 (1910) (provisions affecting Arizona).

The School District points to language stating that "the schools colleges and universities provided for in this Act shall remain forever under the exclusive control of the said State," as proof that the highest law in Arizona requires that the state alone may control the public schools. *Id.* at § 26. However, the Arizona Supreme Court has explained that Enabling Act restrictions on the management of trust lands refer to the congressional curb on Arizona's power to dispose of the lands granted the new state for the schools:

> [Congress] intended the Enabling Act to severely circumscribe the power of state government to deal with the assets of the common school trust. The duties imposed upon the state were the duties of a trustee and not simply the duties of a good business manager.... Thus to comply with Congressional intent, we must strictly apply the Enabling Acts restrictions regarding the disposal of school trust assets.

*Kadish v. Ariz. State Land Dep't,* 155 Ariz. 484, 747 P.2d 1183, 1186 (1987) (prohibiting state from issuing below-true-value mineral leases on land grant property). Likewise, the other cases cited by the School District also deal with restrictions on the state's ability to dispose of trust lands. *See Forest Guardians v. Wells,* 201 Ariz. 255, 34 P.3d 364, 368 (2001) (holding that Commissioner of State Land Department violated fiduciary duties as trustee by rejecting high bids to lease school trust grazing land); *Gladden Farms, Inc. v. State,* 129 Ariz. 516, 633 P.2d 325, 330 (1981) (Enabling Act requires that trust lands may only be sold to highest and best bidder at public auction); *Ariz. State Land Dep't v. R.H. Fulton, Inc.,* 118 Ariz. 404, 577 P.2d 255, 256–57 (1978) (judicial error to limit damages recoverable for wilful trespass on state school trust lands because Enabling Act intended to ensure that trust beneficiaries received the full

and only profit form the disposition of property under the trust). However, the School District has cited no cases indicating that the Enabling Act requires the state alone to manage and control the public schools which benefit from the trust lands.

Further, the Enabling Act provisions regarding granted land and the investment of permanent school funds derived therefrom—which the School District argues demonstrate exclusive state control of education—are identical to the corresponding Enabling Act provisions affecting New Mexico. *See Murphy v. State,* 65 Ariz. 338, 181 P.2d 336, 340 (1947). Considering arguments similar to those advanced here, the Tenth Circuit determined that although the state of New Mexico has general authority over schools statewide, the fact that school boards have considerable autonomy and control means they are not arms of the state entitled to Eleventh Amendment Immunity. *Duke v. Grady Mun. Schs.,* 127 F.3d 972, 978–79 (10th Cir.1997). The identical Enabling Act provisions the School District argues are dispositive here did not compel our sister circuit to find that education is a centralized governmental function. For the reasons noted above, we find the School District's arguments based on the same provisions similarly unpersuasive.

The School District also argues that the Arizona Constitution establishes the public school system as a central function of the state government. Article XI provides that "the legislature shall provide for the establishment and maintenance of a general and uniform public school system." Ariz. Const. art. XI, § 1.A. This, in tandem with the Enabling Act, the School District argues, manifests a constitutional instruction for state rather than local control of the schools. They cite *Roosevelt* for this proposition, arguing that *Roosevelt's* reiteration of the Enabling Act's requirement that "[t]he schools were to be forever

under the *exclusive* control of the state," and invocation of Article XI further indicates that schools perform a central governmental function. 877 P.2d at 812 (emphasis in original).

However, *Roosevelt* was concerned with the state's constitutional responsibility to establish and maintain a "general and uniform public school system," a responsibility the Arizona Supreme Court determined the state had been shirking by relying on school districts to fund the state educational system through property tax revenues, which led to great disparities in the school facilities between property-rich and property-poor districts. *Id.* at 808–09, 812. Thus, the Arizona Supreme Court concluded that while the legislature could delegate "some of its *authority* to other political subdivisions of the state to help finance public education," nothing in the constitution "allows the state to delegate its *responsibility* under the constitution." *Id.* at 813 (emphasis in original). The *Roosevelt* decision led to the establishment of a capital financing scheme that provides state funds for improvements in school facilities.

Yet nothing in *Roosevelt* suggests that actually running the schools is a constitutionally-mandated state function. Throughout the opinion, the Arizona Supreme Court refers to the school districts as entities separate from the state—other "political subdivisions" to which the state has the ability to delegate authority. *See* 877 P.2d at 813. The Court explained:

As long as the statewide system provides an adequate education, and is not itself the cause of substantial disparities, local political subdivisions can go above and beyond the statewide system. Disparities caused by local control do not run afoul of the state constitution because there is nothing in Art. XI that would prohibit a school district or a

county from deciding for itself that it wants an educational system that is even better than the general and uniform system created by the state. Local control in these matters is an important part of our culture.

*Id.* at 814–15.

Clearly, the Arizona Supreme Court views local school districts and counties as entities that are not subject to the same constitutional obligations or constraints as the state; therefore, they must not be considered to be an arm of the state. And as the district court noted, if the School District were an arm of the state, it would violate the state constitution if it raised additional funds via the statutory mechanisms provided for school districts because the state itself is prohibited from creating disparities among school districts. *See Albrecht II*, 960 P.2d at 638 ("Financial disparities caused by local control do not run afoul of the state constitution .... [b]ut the general and uniform requirement will not tolerate a state funding mechanism that itself causes disparities between districts.").

Furthermore, subsequent to *Roosevelt*, *Albrecht I* and *Albrecht II* struck down public school financing legislation in part because it limited local control by school districts. *See Albrecht I*, 950 P.2d at 1145 ("[spending] [c]aps are antithetical to local control and only artificially promote equalization"); *Albrecht II*, 960 P.2d at 638 (striking down state funding provision in part because some districts were "no longer able to employ the historically most important method of securing local funds for school system financing"). Thus, Arizona law attaches particular importance to allowing for local autonomy in managing and funding school districts.

In addition, like Arizona's constitution, Nevada's commands that "[t]he legislature shall provide for a uniform system of common schools." Nev. Const. art. XI, § 2.

Nonetheless, in *Eason* we determined that because the state legislature had provided for substantial local control by local school districts, the state "does not treat public schooling as a state-wide or central government function." 303 F.3d at 1143. *Compare* Nev.Rev.Stat. § 386.010(2) (each school district is "a political subdivision of the State of Nevada whose purpose is to administer the state system of public education"—a provision the court found significant), *with* Ariz.Rev.Stat. § 15–101(20) (" 'School District' means a political subdivision of this state with geographic boundaries organized for the purpose of the administration, support, and maintenance of the public schools or an accommodation school.").

By contrast, although the California constitution contains a constitutional mandate similar to Arizona's and Nevada's directing the state to "provide for a system of common schools," unlike those state constitutions it sets forth detailed requirements for those schools. *See* California Const. art. IX, §§ 5 & 6. Additionally, the California Supreme Court's assessment of the role of local control is very different from Arizona's, as this passage in *Belanger* illustrates:

> The public schools of this state are a matter of statewide rather than local or municipal concern; their establishment, regulation, and operation are covered by the [state] Constitution and the state Legislature is given comprehensive powers in relation thereto.

963 F.2d 248 (citing *Hall v. City of Taft*, 47 Cal.2d 177, 302 P.2d 574 (Cal.1956)). Thus, because of the substantial degree of autonomy given school districts under Arizona law, they are not performing a central governmental function.

### C

The third *Mitchell* factor to be considered in our analysis is whether the entity

may sue or be sued. Under Arizona law, Arizona school districts are explicitly granted the power to sue or be sued in their own name. *See* Ariz.Rev.Stat. § 15–326(1). This fact was underscored in this litigation by the absence of the Arizona Attorney General's participation in the lawsuit; it is defended by the School District alone.

The School District concedes that this factor weighs against it, arguing only that the factor is unimportant, citing a similar provision in California law. However, in *Belanger* we explained that this factor still deserves consideration; it is just entitled to less weight than the first two. 963 F.2d at 254. Because in that case, the first two factors weighed in favor of immunity, this third factor was insufficient to offset them in the Eleventh Amendment analysis. Given that here the first two factors indicate the School District is not an arm of the state, the fact that it has the capacity to sue and be sued adds further support to the conclusion that it is not entitled to sovereign immunity.[4] *See also Eason,* 303 F.3d at 1144 (that Nevada school districts have the capacity to sue or be sued "weighs slightly against holding that the District is an arm of the state").

### D

The fourth *Mitchell* factor that we consider in immunity analysis is whether the school district has power to hold property in its own name. Arizona school districts are empowered by statute to "[h]old and convey property for the use and benefit of the district." Ariz.Rev.Stat. § 15–326(2). Additionally, they may furnish, repair and insure school property, § 15–341(A)(7),

make conveyances of district property in the name of the district, § 15–341(A)(9), and purchase school sites with voter authorization, § 15–341(A)(10).

The School District contends that new legislative changes in the capital financing of school facilities and capital improvements may have an effect on the School District's ownership and control of property. However, while the new legislation strictly controls the districts' use of monies disbursed for capital improvements, there are no express limitations on the district's subsequent ability to hold, manage or control the property acquired with these funds. *See* Ariz.Rev.Stat. § 15–2041. Thus, while the means and mechanism of acquiring school property has been changed by the new legislation, the districts' power over the property so acquired remains unchanged.

The amici school boards associations contend that although the districts have power to hold title to the property, the state is nevertheless the beneficial owner of the property. *Cf. Belanger,* 963 F.2d at 254 (although school districts can hold property in their own name, "[t]he beneficial ownership of property of the public schools is in the state") (quoting *Hall,* 302 P.2d at 577). In support of this contention they cite *Prescott Community Hospital Commission v. Prescott School District No. 1,* 57 Ariz. 492, 115 P.2d 160, 161 (1941), which held that "[s]chool districts are created by the state for the sole purpose of promoting the education of the youth of the state. All their powers are given them and all the property which they own is held by them in trust for the same purpose...." Yet this does not demon-

---

4. Savage points out that the question of whether the state may itself be legally liable for a suit goes not just to the issue of the vulnerability of the state treasury, but also to the dignity of the sovereign itself. *See Regents of the Univ. of Cal. v. Doe,* 519 U.S. 425, 117

S.Ct. 900, 137 L.Ed.2d 55 (1997) (finding Eleventh Amendment immunity even when the state would be indemnified by third party for damages award because the state would still be legally liable).

strate that the state itself is the beneficial owner of the property, only that the School District as trustee for the youth of the state cannot give away property for noneducational purposes, as the district in that case had attempted to do. If the state is the beneficial owner of the school property merely because it originally granted the property with restrictions attached, then all grantors of private trusts would also be the beneficial owners of such trusts long after they had relinquished any interest in the property—a result clearly contrary to law.

Therefore, we conclude that the School District's relationship to the school property is more akin to Nevada's in *Eason* than California's in *Belanger*. In *Eason,* we gave considerable weight to the fact that Nevada school districts had the statutory authority to hold, manage, and control school district property, that it had the power to insure school property, and could sell, rent or lease real property belonging to the School District when it was necessary in the best interests of the school. 303 F.3d at 1144. Notably, the fact that the School District could only dispose of the property if it were in the best interests of the school did not make the state the beneficial owner, as amici contend it should. Therefore, because Arizona school districts have the same managerial powers over their property as did the districts in Nevada, this factor also militates against a finding that the School District is entitled to sovereign immunity.

### E

The final *Mitchell* factor for our consideration is the corporate status of the entity. Arizona law defines school districts as political subdivisions. Ariz.Rev.Stat. § 15–101(20) (" 'School District' means a political subdivision of this state with geographic boundaries organized for the purpose of the administration, support, and maintenance of the public schools or an ac-

commodation school."). Political subdivisions are not included in the law's definition of "state." *See* Ariz.Rev.Stat. § 12–348(I)(3) (" 'State' means this state and any agency, officer, department, board or commission of this state"); § 12–820(7) (" 'State' means this state any state agency, board, commission or department."); § 35–466(6) (" 'State' means this state or any of its departments, agencies or authorities."); § 38–842(26) (" 'State' means the state of Arizona, including any department, office, board, commission, agency, or other instrumentality of the state."). Furthermore, the statute governing public employee disability programs explicitly distinguishes between the state and political subdivisions. *Compare* § 38–797(13) (" 'Political subdivision' means any political subdivision of the state."), *with* § 38–797(14) (" 'State' means this state, including any department, office, board, commission, agency, institution or other instrumentality of this state."). The fact that Ohio state law similarly defined school districts as political subdivisions and excluded political subdivisions from the definition of "State" prompted the Supreme Court to conclude that the school district was not an arm of the state. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

The School District argues that notwithstanding the statutory scheme noted above, Arizona considers school districts to be agencies of the state. However, the cases it cites do not support this contention. *See R.L. Augustine Constr. Co. v. Peoria Unified Sch. Dist. No. 11,* 188 Ariz. 368, 936 P.2d 554 (1997) (a political subdivision is excluded from the definition of administrative agency; however, its decisions may still be judicially reviewed to ensure consistency); *Warrington v. Tempe Elementary Sch. Dist. No. 3,* 187 Ariz. 249, 928 P.2d 673, 675–76 (1996) ("A 'public

entity' for purposes of statutory immunity includes the state and any political subdivision of the state. A school district is a political subdivision.") (citation omitted).

Next the School District cites *School District No. 48 of Maricopa County v. Rivera*, 30 Ariz. 1, 243 P. 609 (1926) as proof that the Arizona Supreme Court considers school districts to be state agencies; in *Rivera*, the Court referred to "school corporations" as both "subdivisions" and "state agenc[ies]," *Id.* at 610. Yet that case concerned the judicially-created state-law doctrine of governmental immunity which extended to both state agencies and political subdivisions alike. *See Stone v. Ariz. Highway Comm'n*, 93 Ariz. 384, 381 P.2d 107, 110 (1963). Thus, the Court in *Rivera* was not careful to draw a distinction between the state and its subdivisions since both were equally immune from tort liability. This state-law governmental immunity doctrine was subsequently abolished by *Stone.* 381 P.2d at 112.

On the other hand, in *Amphitheater Unified School District No. 10 v. Harte*, 128 Ariz. 233, 624 P.2d 1281 (1981) the Arizona Supreme Court explicitly considered and rejected the argument that school districts are not political subdivisions, but agents of the state. There, as in the instant case, a school district was sued under the ACRA. Because the statute precludes suits against the state, the school district moved to dismiss claiming that as an agency of the state it was immune from suit. *Id.* at 1282; *see also* Ariz.Rev.Stat. § 41–1481(D) ("the division may bring a civil action against the respondent, other than the state, named in the charge...."). The Arizona Supreme Court rejected that argument, concluding that the school district was subject to suit because it was "satisfied that the proper classification of

school districts is that of political subdivisions of the state." 624 P.2d at 1282. Thus, it appears that in contrast to California, which does not classify its school districts as political subdivisions but rather agents of the state, *see Belanger*, 963 F.2d at 254, Arizona schools are distinct political subdivisions not accorded the same status as state agencies under Arizona law.[5]

Accordingly, because all five *Mitchell* factors indicate that Arizona schools are not agents of the state for Eleventh Amendment purposes, we affirm the district court's decision not to dismiss the complaint for lack of subject matter jurisdiction.

## IV

■ Because the School District does not benefit from sovereign immunity, the district court properly exercised supplemental jurisdiction. Under 28 U.S.C. § 1367(a), if a federal court has original jurisdiction over a civil action, it may exercise supplemental jurisdiction over state law claims that "are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Here, the same facts and circumstances that form the basis for Savage's claims under the ADA and RA support her ACRA claim. Therefore, supplemental jurisdiction is proper because the School District does not have sovereign immunity and the district court has jurisdiction over the federal claims.

## V

Most communities value local control of their schools. Like most states, Arizona

---

5. Notably, the School District's 1999–2000 Support Staff Guide states in its preface "[t]he Glendale Union High School District is governed by citizens from your school community—a local government."

has chosen to vest the control of school districts in local school boards. However, when a state eschews centralized state control of education, it cannot cloak itself in the immunities afforded the state. Therefore, local school boards in Arizona cannot invoke the protection of the Eleventh Amendment to immunize themselves from appropriate lawsuits in federal court. We affirm the judgment of the district court.

AFFIRMED.