OPINION
MeKEOWN, Circuit Judge:
Public television — a fixture of American life for decades — has showcased Masterpiece Theater, PBS NewsHour, children’s programs such as Sesame Street and Curious George, and many more audience favorites. The hallmark of public broadcasting has been a longstanding restriction on paid advertising to minimize commercialization. In a classic case of “follow the money,” Congress recognized that advertising would change the character of public broadcast programming and undermine the intended distinction between commercial and noncommercial broadcasting.
Public broadcast radio and television stations are regulated by federal statute. Under 47 U.S.C. § 399b, public stations are prohibited from transmitting paid advertisements for for-profit entities, issues of public importance or interest, and political candidates. These restrictions were adopted to minimize commercialization of public broadcast stations, also known as noncommercial educational (“NCE”) stations because they are “used primarily to serve the educational needs of the community; for the advancement of educational programs; and to furnish a nonprofit and noncommercial television broadcast service.” 47 C.F.R. § 73.621.
*1195 Minority Television Project (“Minority TV”), a public television broadcaster, challenges the advertising restrictions as facially unconstitutional under the First Amendment. Applying intermediate scrutiny, as counseled by the Supreme Court in FCC v. League of Women Voters, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984), we uphold the advertising ban as constitutional. We also affirm the district court’s dismissal of Minority TV’s as-applied challenges to § 399b and its challenge to the related regulation, 47 C.F.R. § 73.621(e).
Background
I. Noncommercial Educational Stations
For three-quarters of a century, the Federal Communications Commission (“FCC”) has set aside broadcasting channels for noncommercial educational stations. See 3 Fed.Reg. 364 (Feb. 9, 1938) (reserving channels for NCE FM radio stations); Sixth Report & Order, 41 F.C.C. 148, 158-59 (1952) (reserving channels for NCE television stations); see also 47 U.S.C. § 303(a)-(b) (authorizing the FCC to classify radio stations and “[prescribe the nature of the service to be rendered by each class of licensed stations”). The FCC explained that it was reserving a portion of the broadcast spectrum for NCE television stations because of “the important contributions which noncommercial educational television stations can make in educating the people both in school — at all levels— and also the adult public,” and the “high quality type of programming” available on NCE stations — “programming of an entirely different character from that available on most commercial stations.” Third Notice of Further Proposed Rulemaking, 16 Fed.Reg. 3072, 3079 (1951).
From the start, the FCC recognized that allowing NCE stations to “operate in substantially the same manner as commercial applicants” would not further its goal of ensuring high quality educational programming. 41 F.C.C. at 166 (1952). Initially, NCE stations were prohibited from airing any promotional content — even if it was unpaid — and were only permitted to identify program underwriters by name. See 17 Fed.Reg. 4062 (1952); Commission Policy Concerning the Noncommercial Nature of Educational Broadcast Stations, 86 F.C.C.2d 141, 142, 154 (1981).
In response to concerns that this restriction was broader than necessary to achieve its purpose, the FCC embarked on an extensive notice and comment proceeding between 1978 and 1981. See 86 F.C.C.2d at 141; Commission Policy Concerning the Noncommercial Nature of Educational Broadcast Stations, 90 F.C.C.2d 895, 909 (1982). The FCC undertook this effort “with an eye toward striking a reasonable balance between the financial needs of such stations and their obligation to provide an essentially noncommercial broadcast service.” 86 F.C.C.2d at 141. In crafting new rules, the FCC noted that its “interest in creating a ‘noncommercial’ service has been to remove the programming decisions of public broadcasters from the normal kinds of commercial market pressures under which broadcasters in the unreserved spectrum usually operate.” Id. at 142. Cognizant of First Amendment concerns, the FCC stated that it was adopting “the minimum regulatory structure that preserves a reasonable distinction between commercial and noncommercial broadcasting.” Id. at 144. At the end of lengthy deliberation, the FCC in 1981 set out a new, liberalized broadcast advertising framework. Id. Later that year, after two days of hearings,[1] Congress es *1196 sentially codified the FCC’s new framework in 47 U.S.C. §§ 399a and 399b.[2]
Section 399b — the heart of this ease— prohibits paid advertising, except for advertising for goods and services offered by non-profit organizations. An “advertisement” is defined as material transmitted in exchange for remuneration that is intended:
(1) to promote any service, facility, or product offered by any person who is engaged in such offering for profit;
(2) to express the views of any person with respect to any matter of public importance or interest; or
(3) to support or oppose any candidate for political office.
§ 399b(a). Section 399b allows the airing of promotional content for which consideration is not received. Section 399a, which is not at issue here, permits the use of non-promotional identifying information in donor acknowledgments (for example, lo-gograms and location information). This scheme has been the law for more than 30 years.
II. Minority TV Proceedings
Minority TV is the licensee of a noncommercial educational television station in San Francisco subject to the advertising restrictions in 47 U.S.C. § 399b and 47 C.F.R. § 73.621(e). After another broadcaster complained to the FCC about Minority TV’s underwriting announcements, the FCC commenced a proceeding against Minority TV. The FCC’s Enforcement Bureau found that Minority TV had broadcast announcements that violated § 399b and § 73.621(e) more than 1,911 times, and issued a Notice of Apparent Liability for Forfeiture in the amount of $10,000. 17 FCC Red. 15646 ¶¶ 30, 33 (2002). Minority TV’s announcements were in exchange for consideration and on behalf of for-profit corporations such as Chevrolet, Ford, and Korean Airlines. Id. ¶ 14. The FCC found that the advertisements included improper promotional language. Id. ¶¶ 9, 15. The FCC rejected nearly all of Minority TV’s challenges and issued a forfeiture order for $10,000. 18 FCC Red. 26611 (2003). The FCC denied Minority TV’s application for review and petition for reconsideration. 20 FCC Red. 16923 (2005); 19 FCC Red. 25116 (2004).
Minority TV then filed in this court a petition for review of the FCC orders. After filing the petition, Minority TV paid the $10,000 forfeiture to the FCC in full. We transferred the case to district court.[3]
The district court dismissed Minority TV’s challenges to the notice and the forfeiture order, its as-applied challenges to § 399b, and its facial and as-applied challenges to § 73.621(e) for lack of jurisdiction because the courts of appeals have *1197 exclusive jurisdiction to review FCC regulations and orders. 47 U.S.C. § 402(a). The court explained that § 504(a), the carve-out allowing district courts to review forfeiture orders, applied only to unpaid forfeiture actions. 47 U.S.C. § 504(a).
On cross-motions for summary judgment, the district court granted summary judgment for the FCC on Minority TV’s facial challenges to § 399b. Minority Television Project, Inc. v. FCC, 649 F.Supp.2d 1025, 1048 (N.D.Cal.2009). Invoking the intermediate scrutiny test from League of Women Voters, the court held that the statute was “narrowly tailored to further a substantial government interest.” Id. at 1042. The court pointed to the ample evidence before Congress showing that “the advertising prohibitions were necessary to preserve the unique programming presented by public stations,” id. at 1037, and to “additional material before the Court demonstrating] that the legislative conclusions are supported by substantial evidence,” id. at 1039. In addition, the court held that the statute was not unconstitutionally vague. Id. at 1048.
Minority TV appealed. The panel upheld the ban on for-profit goods and services advertising. Two members of the divided panel issued separate opinions striking down the statute’s ban on issue and political advertising. Minority Television Project, Inc. v. FCC, 676 F.3d 869 (9th Cir.2012). In dissent, Judge Paez determined that §§ 399b(a)(2) and (3) were neither “patently overinclusive [nor] un-derinclusive,” and that there were no “ ‘less restrictive means’ to § 399b that [were] readily available.’ ” Id. at 893-95 (Paez, J., dissenting) (citation omitted). Unlike the panel majority, Judge Paez found substantial record evidence to support § 399b’s narrow tailoring. Id. at 896-97. In an unpublished memorandum disposition, the panel unanimously held that the district court correctly dismissed Minority TV’s as-applied challenges to § 399b and its challenges to 47 C.F.R. § 73.621(e), and that § 399b was not unconstitutionally vague.[4] A majority of nonrecused active judges voted in favor of rehearing en banc. 704 F.3d 1009 (9th Cir.2012).
Analysis
I. Facial Intermediate Scrutiny Challenge to § 399b
A. Framework for Analysis
1. Intermediate Scrutiny Test for Broadcast Regulation
The Supreme Court laid down the standard for evaluating the constitutionality of § 399b — intermediate scrutiny — in League of Women Voters, 468 U.S. at 380, 104 S.Ct. 3106. That case involved a First Amendment challenge to a statutory provision forbidding all NCE stations that received grants from the Corporation for Public Broadcasting from “engaging] in editorializing.” Id. at 366, 104 S.Ct. 3106 (citing 47 U.S.C. § 399 (1980)). The Court declined to apply strict scrutiny even though the statute was content-based and “plainly operate[d] to restrict the expression of editorial opinion on matters of public importance” — a form of speech “entitled to the most exacting degree of First Amendment protection.” Id. at 375-76, 104 S.Ct. 3106. It explained that, “because broadcast regulation involves unique considerations, our cases have not followed precisely the same approach that we have applied to other media and have never gone so far as to demand that such regula *1198 tions serve ‘compelling’ governmental interests.” Id. at 376, 104 S.Ct. 3106.
The Court struck down the ban on editorialization-because it was not “sufficiently tailored to the harms it s[ought] to prevent to justify its substantial interference with broadcasters’ speech.” Id. at 392, 104 S.Ct. 3106. In particular, the ban was “manifestly] impreeis[e]” — both “patently] overinelusive[ ] and underinclusive[ ].” Id. at 392, 396, 104 S.Ct. 3106. The government’s substantial interest in ensuring that viewers did not think broadcasters’ editorials reflected the views of the government could “be fully satisfied by less restrictive means that [were] readily available.” Id. at 395, 104 S.Ct. 3106.
Like the statute at issue in League of Women Voters, § 399b is a content-based broadcast regulation, and we may uphold the statute’s restrictions on advertising only if we are satisfied that they are “narrowly tailored to further a substantial governmental interest.” Id. at 380, 104 S.Ct. 3106. In addition, because subsections (a)(2) and.(a)(3) burden public issue and political speech, we must be “particularly wary in assessing [the statute] to determine whether it reflects an impermissible attempt ‘to allow a government [to] control ... the search for political truth.’” Id. at 384, 104 S.Ct. 3106 (quoting Consolidated Edison Co. v. Public Service Comm’n of N.Y., 447 U.S. 530, 538, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) (alteration in original)).
Minority TV urges us to adopt a strict scrutiny standard. We do not credit Minority TV’s argument that Citizens United v. Federal Election Comm’n, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010), overruled decades of precedent sub silen-tio — especially given that the Court there expressly overruled two other cases with no mention of League of Women Voters or an intent to change the level of scrutiny for broadcasting. Citizens United was not about broadcast regulation; it was about the validity of a statute banning political speech by corporations. Had Citizens United changed the standard for broadcast regulation, presumably the Supreme Court would have recognized as much two years later in FCC v. Fox Television Stations, — U.S. -, 132 S.Ct. 2307, 2320, 183 L.Ed.2d 234 (2012), rather than declining to address the broadcasters’ claim that precedent providing for less rigorous scrutiny of broadcast regulation “should be overruled because the rationale of that case has been overtaken by technological change.” The Supreme Court has not gone there and neither should we, absent a complete record on the subject and a change of direction by the Supreme Court. This case is not a suitable one for such fundamental reconsideration of longstanding precedent.[5]
2. Scope of the Record
We are presented with an ample record to support § 399b, consisting both of evidence that was before Congress in 1981 and evidence before the district court that covered the period after enactment. Following the Supreme Court’s lead, we look to “the evidence before Congress and then the further evidence presented to the District Court.” Turner Broadcasting Sys. v. FCC, 520 U.S. 180, 196, 117 S.Ct. *1199 1174, 137 L.Ed.2d 369 (1997) (“Turner II”). As a matter of course, in multiple First Amendment cases, the Court has looked beyond the record before Congress at the time of enactment. See, e.g., League of Women Voters, 468 U.S. at 387 & n. 18, 390 & n. 19, 392 n. 21, 393 n. 22, 104 S.Ct. 3106 (looking to testimony before Congress as well as reports and other evidence following the statute’s enactment), and United States v. Playboy Ent. Grp., 529 U.S. 803, 821-22, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (faulting the government for failing to produce additional “probative evidence” to supplement the “near barren legislative record” in applying strict scrutiny).
Congress enacted §§ 399a and 399b after a two-year FCC notice and comment proceeding, days of hearings, and a thoughtful committee report. Indeed, the record before Congress provides a sufficient basis to uphold the statute even without the supplemental evidence offered in the district court. This case “does not present a close call” requiring us to elaborate on what evidentiary burden Congress bears in enacting a law that implicates First Amendment rights. Nixon v. Shrink Missouri Gov’t PAC, 528 U.S. 377, 393, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000); see also Sable Comm. of Cal., Inc. v. FCC, 492 U.S. 115, 133, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989) (Scalia, J., concurring) (“Neither due process nor the First Amendment requires legislation to be supported by committee reports, floor debates, or even consideration, but only by a vote.”).
It is clear, however, that Congress is “not obligated, when enacting its statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review.” Turner Broadcasting Sys. v. FCC, 512 U.S. 622, 666, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (“Turner I”). We reject Minority TV’s suggestions to the contrary. The dissent’s insistence on “evidence” in the technical sense is misplaced. We are not abdicating to a congressional whim or succumbing to some notion that “judges like public radio and television,” Dissent at 1212, simply because we give credence to congressional findings. Pure and simple, the dissent doesn’t like what Congress found after considering extensive FCC administrative proceedings, holding its own hearings, and preparing a committee report. Congress is a political body that operates through hearings, findings, and legislation; it is not a court of law bound by federal rules of evidence. Ignoring fundamental principles of separation of powers, the dissent would rewrite the legislation, ignore the congressional evidence, and substitute pop culture and its own policy judgment for that of Congress.
In enacting §§ 399a and 399b, Congress made a prediction about the effects of underwriting announcements, logograms, and advertising on public broadcast programming. We must accord deference “to [Congress’s] findings as to the harm to be avoided and to the remedial measures adopted for that end, lest we infringe on traditional legislative authority to make predictive judgments when enacting nationwide regulatory policy.” Turner II, 520 U.S. at 196, 117 S.Ct. 1174. Congressional concern and prognostication was well informed, but the information before Congress was necessarily limited because advertising had never been allowed on NCE stations. The First Amendment does not require Congress to wait for a feared harm to take place before it can act. Such a high bar would make little practical sense — it would tie Congress in knots and strip it of its ability to adopt forward thinking public policy. “Sound policymak-ing often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empiri *1200 cal support may be unavailable.” Turner I, 512 U.S. at 665, 114 S.Ct. 2445.
Apart from the evidence that was before Congress in 1981, the government presented significant additional evidence, including a 2007 report by the Government Accountability Office (“GAO”) on public television; the report of the Temporary Commission on Alternative Financing for Public Telecommunications, which oversaw an experiment with limited advertising on public television; information about political advertising; an expert report from a Stanford University professor emeritus with over 40 years of experience in studying the economics of broadcasting and public television; and a declaration from a vice president of a foundation that operates numerous noncommercial educational radio and television stations.
We conclude that substantial evidence before Congress supported the conclusion that the advertising prohibited by § 399b posed a threat to the noncommercial, educational nature of NCE programming and that the additional evidence bears out Congress’s predictive judgment in enacting § 399b. Minority TV’s scant evidentiary showing reinforces this conclusion. See Nixon, 528 U.S. at 394, 120 S.Ct. 897 (noting that more extensive evidence might be required if the parties challenging the statute “had made any showing of their own to cast doubt” on the evidence supporting it). Similarly, the dissent offers only speculation not substance for its view that permitting unfettered advertising wouldn’t lead to distortion and perverse incentives. Poking holes in the congressional evidence is hardly a substitute for the scrutiny required of this court.
B. Intermediate Scrutiny Analysis op Section 399b
We now turn to a more detailed analysis of whether § 399b is “narrowly tailored to further a substantial governmental interest.” League of Women Voters, 468 U.S. at 380, 104 S.Ct. 3106. Section 399b was enacted in 1981 against the backdrop of declining federal support for public broadcasting. Congress was acutely aware that public broadcasting needed new sources of revenue to survive, but it was also worried about undermining the essential nature of public broadcast programming. The FCC had just promulgated new, liberalized regulations that were “designed to further the important governmental interest in preserving the essentially noncommercial nature of public broadcasting within a minimal regulatory framework by insulating public broadcasters from commercial marketplace pressures and decisions.” 90 F.C.C.2d 895, 896 (1982) (statement by FCC Commissioner Washburn clarifying the impact of the Public Broadcasting Amendments Act on the recently issued regulations) (emphasis in original). The FCC believed the liberalized advertising restrictions “satisf[ied] constitutional objections.” Id. Congress agreed, and so do we.
1. Substantial Governmental Interest
Federal regulation of the broadcast spectrum, a scarce public resource, is entitled to more deferential First Amendment review than regulation of other types of media. See Reno v. ACLU, 521 U.S. 844, 868, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (highlighting the “special justifications for regulation of the broadcast media that are not applicable to other speakers,” including the “history of extensive Government regulation of the broadcast medium,” “the scarcity of available frequencies at its inception,” and “its ‘invasive’ nature”) (citations omitted); Turner I, 512 U.S. at 637, 114 S.Ct. 2445 (noting that the “justification for [the Court’s] distinct approach to broadcast regulation rests on the unique physical limitations of the broadcast medium”). This deferential review is not strict scrutiny light, but instead requires us to *1201 benchmark the statute against the requirements of League of Women Voters, including the government’s substantial interest. Section 399b’s advertising restrictions speak directly to the government’s substantial interest in maintaining the unique, free programming niche filled by public television and radio. That Minority TV does not contest the government’s substantial interest in ensuring the diversity and quality of public broadcast programming is no surprise. Nonetheless, it is useful to detail the nature and scope of the government’s interest both as a prelude to and a basis for informing our narrow tailoring analysis.
The First Amendment rights of Minority TV and potential advertisers do not exist in a vacuum. The Supreme Court has recognized the public’s right “to receive suitable access [through broadcast media] to social, political, esthetic, moral, and other ideas and experiences.” Red Lion Broad. Co. v. FCC, 395 U.S. 367, 390, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). “Balancing the various First Amendment interests involved in the broadcast media and determining what best serves the public’s right to be informed is a task of great delicacy and difficulty,” and “we must afford great weight to the decisions of Congress and the experience of the [FCC].” Columbia Broad. Sys. v. Democratic Nat’l Comm., 412 U.S. 94, 102, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973).
In pursuit of its goal, the government set aside specific channels for noncommercial use, provided funding through the Corporation for Public Broadcasting and other means, and created special requirements and restrictions for NCE stations. See, e.g., 47 U.S.C. §§ 303(a)-(b), 394, 396, 399a, 399b; 47 C.F.R. § 73.503. However, the dissent fails to appreciate that section 399(b) is a central prong of these structural constraints and that they operate as a package to effectuate congressional intent. The dissent’s selective excision-of a foundational principle of public television undermines the integrated legislative package and ignores the FCC’s experience with public television. Section 399b does not stand alone; it is an important piece of a comprehensive scheme to promote programming that is differentiated from the typical commercial fare.
Numerous statutes and reports recognize the unique nature of NCE' programming. For example, when the FCC first set aside television channels for noncommercial use, it pointed to “the important contributions which noncommercial educational television stations can make” and the “high quality type of programming” available on NCE stations — “programming of an entirely different character from that available on most commercial stations.” Third Notice of Further Proposed Rulemaking, 16 Fed.Reg. 3072, 3079 (1951). In the Public Broadcasting Act of 1967, which, among other things, established the Corporation for Public Broadcasting, Congress found that “[i]t furthers the general welfare to encourage public telecommunications services which will be responsive to the interests of people both in particular localities and throughout the United States, which will constitute an expression of diversity and excellence, and which will constitute a source of alternative telecommunications services for all the citizens of the Nation.” 47 U.S.C. § 396(a)(5). And in passing the Children’s Television Act of 1990, the Senate explained .that “public television is the primary source of educational children’s programming in the United States.”[6] S. Rep. 101-66, at 7 (1989), 1990 U.S.C.C.A.N. 1628.
*1202 The unrebutted evidence before us documents that programming on public broadcast stations is markedly different from that on commercial stations. That was true in 1981 when Congress enacted § 399b, and it is true now. As the district court noted, “Congress did not write on a blank slate when it enacted Section 399b; rather, after a half-century of experience with public broadcasting, the record before Congress showed that public television and radio stations carry very different programming than do commercial stations.” 649 F.Supp.2d at 1036. For example, there was testimony before Congress that public radio allows “7 or 15 minutes to explore an issue, rather than being confined to the 30-60- and 90-second snatches common to commercial stations,” provides “the only network for the blind,” “gives you jazz live,” and provides four hours of daily news of a different nature than that provided by commercial stations. H. Hgs. at 323 (Walda W. Roseman, Senior Vice President, National Public Radio (“NPR”)).
Stanford University Professor Emeritus Roger Noll, a government expert who has spent over forty years studying the economics of broadcasting and public television, presented evidence that “noncommercial stations offer statistically significantly more public affairs, children’s and family programming, and statistically significantly less violent programming, than both affiliates of commercial networks and all other commercial stations.” According to the Government Accountability Office, public broadcasters devote 16 percent of all program hours to educational children’s programming,[7] compared to the 3.32 hours per week the average commercial broadcaster gives to such programming. Many NCE stations also broadcast instructional programming for adults, including GED preparation, community college telecourses, and professional growth programming for teachers and administrators. In addition, some public broadcast stations are the only source of local programming that is not related to news or sports.
The primary harm § 399b sought to prevent was the loss of the distinctive content of public broadcast programming. Congress heard from dozens of witnesses who testified, among other things, that “[e]om-mercialization will make public television indistinguishable from the new commercial or pay culture cable services,” H. Hgs. at 149 (Larry Sapadin, Executive Director, Association of Independent Video & Filmmakers, Inc.), and that NCE-type programming “is just not possible with the commercial constraints of providing a commercial service,” H. Hgs. at 323 (Walda W. Roseman, NPR). “All consumer and public interest group representatives” who testified “were concerned about what they viewed as a trend towards the commercialism of public broadcasting.” H.R.Rep. No. 97-82, at 9 (1981).
One of the major themes in the evidence before Congress was that advertising distorts programming decisions because advertisers have something to sell — be it a product, message, or candidate — and they want to sell it to the largest audience possible. Representative Robert Matsui, a former member of the Communications Subcommittee, explained that the “principal thrust of commercial broadcasting ... is controlled by its need to reach mass *1203 audiences in order to sell products. While this mass approach is definitely a valid purpose, commercial broadcasting is unable thereby to respond to the myriad of individual needs of any community.... It simply does not possess the programming flexibility to tailor shows to serve the numerous characteristics of each community.” Hi Hgs 30-31. Similarly, an article submitted to the House by the National Association of Educational Broadcasters explained that public broadcasters “don’t aim to amuse the lowest common denominator of the audience because we’re not seeking the highest ratings possible. Because we don’t carry ads. Because the law won’t let us.” H. Hgs. 226-27; see also H. Hgs. 129-30 (John C. DeWitt, American Found, for the Blind) (testifying that “commercialization of public broadcasting ... run[s] the danger that [broadcasters] will focus on the lowest common denominator of programming” rather than on serving “diverse audiences” like minorities, women, and the print handicapped). One member of the House of Representatives summed up this concern: ‘Will the search for dollars compromise [public broadcasting’s] creative genius? Will there be strings attached to the money that is given to public broadcasting so that the most courageous and needed programs are not funded for fear of controversy — or simply fear itself?” 127 Cong. Rec. 13148 (June 22,1981) (Rep. Waxman).
The commercialization Congress feared was not restricted to typical commercial business advertising. Rather, Congress was worried about the commercialization of public broadcasting itself: the selling of airtime. See, e.g., H. Hgs. 71 (Senator Wirth describing how the' “selling of time” would transform public broadcasting by leading stations to make programming decisions based on their calculations of the advertising value of shows); see also H. Hgs. 149 (the Executive Director of the Association of Independent Video & Filmmakers, Inc., emphasizing that “[s]elling makes its own demands”).
Congress heard testimony about the need to protect public broadcasting from all special interests whose advertising dollars could affect programming decisions. See H. Hgs. 112 (Jack Golodner, Director, Department for Professional Employees, AFL-CIO) (“[I]f public broadcasting is to perform its role ..., then sufficient public funding must be made available so that to the furthest extent humanly possible, it is insulated from political, corporate, and, for that matter, labor influence.”). The record shows that Congress was concerned with “insulat[ing] public broadcasting from special interest influences — political, commercial, or any other kind.” 127 Cong. Rec. 13145 (1981) (Rep. Gonzales); see also H.R.Rep. No. 97-82, at 16 (1981) (listing as a criterion for alternative financing mechanisms the “insulation of program control and content from the influence of special interests — be they commercial, political or religious”).
Evidence before the district court reinforces the congressional view that if advertising were allowed, programming would “follow the money,” changing the nature of public broadcast programming. The research cited by Noll is consistent with much of the testimony before Congress, and . it bears out Congress’s predictive judgment that advertising would change the face of public broadcasting. Noll explained that commercial broadcasting suffers from a “market failure” in that a “competitive, advertiser-supported television system leads to an emphasis on mass entertainment programming with insufficient attention to programs that serve a small audience, even if that audience has an intense desire to watch programs that differ from standard mass entertainment programs.” According to Noll, in order to attract advertising dollars, NCE stations *1204 would have to change their programming to be more like that on commercial stations — programming that advertisers prefer because it attracts large audiences.
The diversity and quality of programming on public broadcast stations stems both from the restrictions on advertising and from the incentives created by the existing funding structure. Funding for NCE stations comes from federal, state, and local subsidies; donations from viewers; and program underwriters including corporations, foundations, and other entities. Noll explained that, “[b]ecause the viability of public television stations depends on attracting donations, stations are motivated to offer programs that encourage voluntary contributions from the communities that they serve.”
Lance Ozier, the Vice-President for Planning and Policy of the WGBH Educational Foundation, detailed that funding from federal and state government sources as well as foundations and other not-for-profit underwriters would be jeopardized if NCE stations were permitted to air paid advertisements. Ozier stated that the loss of funding would not be restricted to those stations who chose to air advertisements: “Every public station would face the consequences generally of a perceived deviation from the public education mission.”
In 2007, the GAO reported that many of the public television licensees with whom it spoke opposed greater underwriting flexibility. The large majority that opposed greater underwriting flexibility said that it “would not generate increased underwriting revenues, since corporations and advertisers desire programming with high ratings and a targeted demographic,” “would upset viewers and contribute to a decline in membership support,” “could threaten a licensee’s ability to receive financial support from a state government,” and “would be inconsistent with the mission of public television and could alter programming decisions.”
’ The upshot of the evidence — starting with the FCC study, buttressed during congressional hearings, and reinforced by additional evidence before the district court — is that the government has a substantial interest in imposing advertising restrictions in order to preserve the essence of public broadcast programming.
2. Narrow Tailoring
With this substantial interest in mind, the next question in our intermediate scrutiny analysis is whether the law is “narrowly tailored to further [that] substantial government interest.” League of Women Voters, 468 U.S. at 380, 104 S.Ct. 3106. Unlike strict scrutiny, intermediate scrutiny does not require that the means chosen by Congress be the least restrictive. See Turner I, 512 U.S. at 662, 114 S.Ct. 2445; United Brotherhood of Carpenters & Joiners of Am. Local 586 v. NLRB, 540 F.3d 957, 968 (9th Cir.2008). As the Supreme Court succinctly noted in a commercial speech case, narrow tailoring requires “a ‘fit’ between the legislature’s ends and the means chosen to accomplish those ends.” Bd. of Tr. of the State Univ. of New York v. Fox, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (citation omitted).
Understanding the contrast between this case and the ban on editorialization in League of Women Voters is a useful starting point in the narrow tailoring analysis. See 468 U.S. at 393, 104 S.Ct. 3106. That ban was patently overinclusive because it “include[d] within its grip a potentially infinite variety of speech” that was not related to the government’s interests in protecting NCE stations from “being coerced ... into becoming vehicles for government propagandizing or the objects of governmental influence.” Id. at 393, 396, 104 *1205 S.Ct. 3106. The restriction was also patently underinclusive. Id. at 396, 104 S.Ct. 3106. Because the stations remained “fully able to broadcast controversial views so long as such views [were] not labeled as [their] own,” the ban did not effectively “reduce the risk of government retaliation and interference.” Id. at 384-85, 104 S.Ct. 3106. There was also evidence that some supporters of the bill were less concerned with the risk of government control of NCE stations than they were with protecting themselves from critical speech. Id. at 387 n. 18, 104 S.Ct. 3106 (quoting the provision’s chief sponsor, who explained that some representatives “have very strong feelings because they have been editorialized against”). Finally, the government’s interest in ensuring that audiences would not presume that broadcasters’ editorials reflected official government views could have been easily satisfied by a less restrictive regulation requiring NCE stations to broadcast a disclaimer when they editorialized. Id. at 395, 104 S.Ct. 3106. In short, there was very little fit between the ban and its stated purposes.
In contrast, § 399b’s restrictions are narrowly tailored to the harms, Congress sought to prevent. Having documented the link between advertising and programming, Congress-reaffirmed the long-standing ban on advertising .on NCE stations, but in a more targeted manner. In place of the prior absolute ban on promotional content, which swept within its reach a wide range of speech that did not pose a significant risk to public programming, Congress enacted targeted restrictions that leave untouched speech that does not undermine the goals of the statute. The restrictions leave broadcasters free to air enhanced underwriting, which both the FCC and Congress determined did not pose the same risk to programming as advertisements. Broadcasters may air any promotional content for which consideration was not received. Finally, the statute permits non-profit advertisements. As to this latter category, the government offered evidence that non-profit advertisements, which are few in number and perceived by the public as consistent with the mission of public broadcasting, do not pose the same threat as other forms of advertising.
Section 399b’s prohibitions are specifically targeted at the real threat — the influence of paid advertising dollars. Congress identified significant special interests that pump money into advertising, setting out three subsets of advertisers — typical for-profit businesses, political candidates, and advocacy groups. The term “advertisement” is defined by reference to these three subsets, which taken together have a single effect: to prevent the commercialization of public broadcasting by prohibiting nearly all advertising. Although the-dissent proffers unsupported distinctions between political or issue advertisements and commercial advertisements they are not germane to the overall threat that Congress targeted: commercialization through advertising.
Unlike the ban on editorialization, which was underinclusive to the point of ineffectiveness, § 399b effectively “insulate[s] public broadcasting from special interest influences — political, commercial, or any other kind.” 127- Cong. Rec. 13145 (1981). More than thirty years since § 399b was enacted, the continuing differences between public broadcasting and commercial broadcasting are a testament to the statute’s success in promoting Congress’s purpose. The government provided expert evidence that the “present system of financing public television is effective” — that it “improves diversity of programming” while “avoiding problems associated with advertisements.” ■ Minority TV’s unsupported assertion that “399b’s attempt to prevent the ‘buying’ of influence cannot *1206 possibly be effective” because “groups, entities, and individuals” can still “attempt to ‘buy’ influence” by making donations is not persuasive. Not only is there no evidence that donations affect programming; there is a huge difference between a donation and targeted advertising.
The dissent acknowledges the evidence before Congress and the district court, but offers its own theories of how to protect public broadcasting. Contrasting the actual evidence and the dissent’s proposals illustrates the difference between the strict scrutiny standard that the dissent hoped we would apply and the intermediate scrutiny standard that we are bound to apply. We do not demand mathematical precision from Congress; rather, we demand a “fit” between the ends and the chosen means. Fox, 492 U.S. at 480, 109 S.Ct. 3028. The evidence in this case easily demonstrates a fit between section 399(b) and the substantial interest in protecting the essence of public broadcasting. Therefore, section 399(b) survives intermediate scrutiny on this prong of the analysis under League of Women Voters.
a. Overinclusiveness: Challenge to Issue and Political Advertising Restrictions
Minority TV essentially lets pass § 399b’s restriction on for-profit goods and service advertising and focuses its attack on the political and issue advertising restrictions. This attack rests on a distinction without a difference. - Congress was trying to prevent the commercialization of public broadcasting itself, not simply advertisements- by commercial businesses.
Minority TV mistakenly attempts to equate congressional focus on commercialization with for-profit businesses; but this reading is at odds with congressional intent. Congress determined that the “insulation of program control and content from the influence of special interests — be they commercial, political or religious” — was necessary. See H.R.Rep. No. 97-82, at 16 (1981). The government’s evidence regarding the enormous sums spent on political advertising confirms Congress’s prediction that, like advertising by for-profit entities, political advertising dollars have the power to distort programming decisions. In 2008 alone, political advertisers spent $2.2 billion. As the campaign season gets longer and longer, commercial television viewers are bombarded with political and issue advertising. Prohibiting only goods and services advertising and allowing issue and political advertising would have shifted incentives and left a gaping hole in § 399b’s protections.
We recognize the special place political speech has in our First Amendment jurisprudence. Morse v. Frederick, 551 U.S. 393, 403, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) (“Political speech, of course, is ‘at the core of what the First Amendment is designed to protect.’ ”) (citation omitted). But there is no evidence that Congress was targeting political speech, critical speech or particular viewpoints as opposed to the programming influence exerted by advertising dollars. Cf. League of Women Voters, 468 U.S. at 387 n. 18, 104 S.Ct. 3106 (noting that some supporters of the ban on editorialization “appear to have been more concerned with preventing the possibility that these stations would criticize Government officials” than with the risk of undue government influence).
Each form of prohibited advertising poses a similar threat. Whether selling financial services, a state senator, or a voter initiative, advertisers seek the largest possible audience. See H. Hgs. 149 (“The purpose of advertising is simply to sell — a product or an image. Selling makes its own demands.”) (Larry Sapadin, Executive Director, Association of Independent Video & Filmmakers, Inc.). Advertisers *1207 also seek programming that is consistent — or at least not contrary to — their messages and values, or the values of their customers or constituencies. See Yoo, Christopher S., Architectural Censorship and the FCC, Regulation, vol. 28, issue 1 (2005), at 24 (“Anecdotal evidence suggests that some advertisers have discouraged networks from offering programming that addresses controversial issues or that casts their products in an unflattering light. In addition, reliance on advertising support leaves programmers vulnerable to the political biases of advertisers and special interest groups.”). Finally, selling programs would essentially convert public broadcasting into commercial broadcasting. See, e.g., H. Hgs. 71 (“If we get public broadcasting into the selling of time, how do we avoid then getting public broadcasting ... into a very large commitment of their own to figure out what demographics they are touching or what the measurement is going to be able to be of that particular population, and how much X program sells for and how much Y program sells for?”) (Sen. Wirth). It strains logic to suggest that advertisers would compete intensely to run ads for a state senator or a voter initiative on guns or taxes during Sesame Street or Mister Rogers. Children are hardly the appropriate target audience.
Minority TV argues that more was needed before Congress could prohibit issue and political advertising. We disagree. Substantial evidence before Congress supported its determination that the selling of airtime to political and issue advertisers, as with for-profit advertisers, would distort programming decisions. As the Court observed in Turner II in rejecting the dissent’s insistence that Congress was required to have more information before it could enact the cable must-carry legislation, that level of factfinding “would be an improper burden for courts to impose on the Legislative Branch.” 520 U.S. at 213, 117 S.Ct. 1174. “That amount of detail is as unreasonable in the legislative context as it is constitutionally unwarranted.” Id. Congress’s prophylactic action, based on common sense, congressional understanding of how political advertising works, and record evidence, did not need to await an empirical study to support its predictions. See Turner I, 512 U.S. at 665, 114 S.Ct. 2445 (“Sound policymaking often requires legislatures to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable.”).
Congress’s determination that all three kinds of advertising posed a significant threat to public programming is supported by substantial evidence, and Minority TV does not point to any evidence indicating that issue and political advertising are less likely to result in commercialization than corporate goods and services advertising. Its argument as to overinclusiveness doesn’t pan out.
b. Underinclusiveness: Challenge to Permitting Advertising by Non-Profit Entities
Minority TV makes much of the fact that § 399b does not prohibit advertising by non-profit entities. It frames this as an argument that § 399b favors commercial speech — advertising by non-profits — over non-commercial speech — political and issue advertisements. Minority TV ms that the statute “clearly inverts the hierarchy of constitutional protections of speech.” There is, however, a documented reason for exempting this tiny slice of advertising from the overall restrictions — non-profit advertising is a drop in the bucket money wise and this limited advertising has no programmatic impact.
Although the cases that Minority TV relies on for this argument concern newspaper racks and portable signs, the *1208 argument itself appears to come straight from the law of billboards. It is true that, with respect to billboards, “an ordinance is invalid if it imposes greater restrictions on noncommercial than on commercial billboards.” Nat’l Adver. Co. v. Orange, 861 F.2d 246 (9th Cir.1988). But public broadcasting stations are not billboards, and broadcast regulations are not subject to the formulation for billboards, newspaper racks, or signs. “Each method of communicating ideas is ‘a law unto itself and that law must reflect the ‘differing natures, values, abuses and dangers’ of each method.” Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 501, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (quoting Kovacs v. Cooper, 336 U.S. 77, 97, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (Jackson, J., concurring)).
Even if this longstanding distinction were cast aside, Minority TV’s reliance on cases such as Ballen v. Redmond, 466 F.3d 736 (9th Cir.2006), and Cincinnati v. Discovery Network, 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), is misplaced. In Bailen, for example, the sign ordinance was ostensibly intended to promote safety and community aesthetics. Instead, the ordinance discriminated on the basis of content and the permitted signs created the same harms as the prohibited ones. This was a classic mismatch between the restriction and its stated purpose. Unlike the statute here, the ordinance in Ballen was not “a reasonable fit between the restriction and the goal[.]” 466 F.3d at 744. Discovery Network also underscored the same absence of “reasonable fit” because the ordinance was directed to such a “paltry” aspect of the purported problems posed by newspaper racks. 507 U.S. at 417-18, 113 S.Ct. 1505.
To the extent that Minority TV is making an underinclusiveness argument — that § 399b is underinclusive because it does not prohibit goods and services advertising by non-profits — that attack also fails. See Sorrell v. IMS Health, Inc., — U.S. -, 131 S.Ct. 2653, 2668, 180 L.Ed.2d 544 (2011) (explaining that “[rjules that burden protected expression may not be sustained when the options provided by the State are too narrow to advance legitimate government interests”); see also Mainstream Mktg. Servs., Inc. v. FTC, 358 F.3d 1228, 1238-39 (10th Cir.2004) (“The underinclusiveness of a commercial speech regulation is relevant only if it renders the regulatory framework so irrational that it fails materially to advance the aims that it was purportedly designed to further.”). The statute in League of Women Voters was “patently] ... under-inelusive[ ]” and “ ‘provide[d] only ineffective or remote support for the government’s purpose,’” whereas § 399b has been effective in meeting the .government’s asserted interest. 468 U.S. at 396, 104 S.Ct. 3106 (quoting Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm’n of N.Y., 447 U.S. 557, 564, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)). Allowing nonprofit advertising has not thwarted § 399b’s goals.
In promulgating its newly liberalized 1981 regulations, the FCC noted that “[m]any commenting parties were concerned with the proscription” on promoting the sale of products or services as applied to announcements made on behalf of non-profit entities or the station itself. 86 F.C.C.2d. at 144. The FCC addressed this concern by limiting the ban to announcements for which consideration was received. Id. at 148-49. Congress went one step further in narrowly tailoring the legislation, by allowing non-profit advertising for goods and services without regard to whether consideration was received.
Congress’s prediction that non-profit advertising would not pose the same risk to public broadcasting as the restricted types of advertising is borne out by the record. *1209 Lance Ozier from the WGBH Educational Foundation explained that advertising by non-profit entities “do[es] not present the same danger” to public television as prohibited forms of advertising because (1) “viewers generally have seen messages from [non-profit] entities as being consistent with the public education mission of public television,” so advertisements by non-profit entities “do not threaten traditional funding sources” like viewer donations and government grants, and (2) “there is a much smaller set of not-for-profit advertisers than there is of for-profit advertisers.” Non-profit advertising sales are so small that they did not even register on the breakdown of public television revenue sources presented by the government. Indeed, there is only a single actual non-profit announcement in the record before us, and it is not one that Minority TV sought to broadcast. Non-profit advertising does not pose the same threat as commercial, political, or issue advertisements in large part because the number of corporate advertisers dwarfs the number of potential non-profit advertisers. In the end, exempting non-profit advertising underscores, rather than undermines, Congress’s narrow tailoring.
c. No Sufficient Less Restrictive Means
The goals of § 399b cannot “be fully satisfied by less restrictive means that are readily available.” 468 U.S. at 395, 104 S.Ct. 3106. Section 399b already is a less restrictive means of ensuring diverse, high quality programming on public broadcast stations than either the previous promotional prohibition or any attempt to directly regulate program content rather than advertising.[8] The latter approach would not only be less effective, it would open a different can of First Amendment worms.
Minority TV insists that time, place, and manner restrictions could achieve the same goals. Without any support as to correlation with Congressional goals, Minority TV blithely suggests limiting the number of underwriting announcements or permitting advertising that doesn’t interrupt programming and is limited in length. But that argument runs counter to the evidence. Lance Ozier concluded that NCE stations would “be forced to change [their] programming substantially ... even if advertisements did not interrupt programming or if they were limited in length.” Ozier explained that, “should public broadcasting be perceived as being ‘commercial,’ ” NCE stations would have a harder time soliciting donations from viewers and might lose funding from federal and state government sources, foundations, and other not-for-profit underwriters. The stations could also experience increased costs by losing the beneficial treatment they currently receive in negotiating labor contracts and broadcast rights.
Minority TV also ignores the history of the Advertising Demonstration Program, an experiment authorized by the Public Broadcasting Act of 1981 that allowed advertisements on some public broadcast stations subject to the very restrictions Minority TV proffers — that the advertisements not interrupt programming and be limited in length. The Temporary Commission on Alternative Financing for Public Telecommunications (“the Commission”), which was charged with overseeing *1210 the experiment, concluded that “the benefit that some public broadcasting stations might gain additional revenues from the authorization of limited advertising does not balance the potential risks identified in this report.” Among the potential risks identified were those noted by Ozier. For example, representatives of the five major unions involved with program production told the Commission that they “may seek ‘commercial’ rates and rights agreements from public broadcast stations that air limited advertisements,” and copyright-owners’ representatives similarly indicated that they might seek higher payments from those stations.[9] Based on the results of the experiment, the Commission recommended that Congress leave § 399b’s prohibitions in place. It is rare to have the benefit of a comparison when judging less restrictive means. We cannot ignore experience with alternatives that demonstrates that § 399 is narrowly tailored to accomplishing Congress’s goals.[10]
Finally, although Congress may not have considered a pure time, place and manner restriction, as Minority TV claims it should have, it did evaluate less restrictive alternatives. The House considered an alternative to § 399b that would have allowed institutional advertisements that did not interrupt regular programming and did not exceed thirty seconds in duration. H. Hgs. 24 (proposed text of H.R. 2774). While some of those who testified before Congress supported allowing institutional advertisements, many opposed it. See, e.g., H. Hgs. 229 (David Ives, president of WGBH TV in Boston) (stating that allowing logograms “liberalizes our rules without compromising our principles,” but that permitting even limited institutional advertisements would “blur the distinction between us and commercial stations”); H. Hgs. 149 (Association of Independent Video and Filmmakers, Inc.) (“Even tasteful, institutional advertising will give rise to programming that will conform to the purposes of corporate image-building....”).
II.Facial Vagueness Challenge to § 399b
Section 399b’s prohibition of paid messages intended to “promote” any service, facility, or product of a for-profit entity is not unconstitutionally vague. A statute need not have “mathematical certainty” to survive a vagueness challenge; instead, it may be marked by “flexibility and reasonable breadth, rather than meticulous specificity.” Grayned v. City of Rockford, 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (citation omitted). Nonetheless, the meaning of the term “promoting” a product or service is fully within “common understanding” and is clear in the vast majority of circumstances. Cal. Teachers Ass’n v. State Bd. of Educ., 271 F.3d 1141, 1151 (9th Cir.2001). To the extent it is not, the FCC — to remove uncertainty— *1211 provides declaratory rulings to broadcasters who fear they might run afoul of § 399b. 47 C.F.R. § 1.2. This guidance serves to “sufficiently narrow potentially vague or arbitrary interpretations” of the statute. Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 504, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).
III. As-Applied Challenge to § 399b and Challenges to 47 C.F.R. § 73.621(e)
The district court correctly dismissed Minority TV’s as-applied challenges to § 399b and its challenges to 47 C.F.R. § 73.621(e). Section 399b was applied to Minority TV only through FCC orders and regulations, including 47 C.F.R. § 73.621(e). Jurisdiction over challenges to FCC orders lies exclusively in the court of appeals; as such, federal district courts lack jurisdiction over appeals of FCC orders. 28 U.S.C. § 2342(1) (“The court of appeals ... has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part) or determine the validity of ... all final orders of the Federal Communications Commission.”). See also United States v. Dunifer, 219 F.3d 1004, 1007 (9th Cir.2000) (explaining that district courts lack jurisdiction over any challenge to FCC regulations).
Although the Supreme Court has previously reviewed a First Amendment challenge to an FCC regulation that was initially filed in federal district court, see Greater New Orleans Broadcasting Ass’n v. United States, 527 U.S. 173, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999), the Court in that case did not address — and was not asked to address — whether jurisdiction in the district court was proper. Courts “are not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed sub silentio.” United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 38, 73 S.Ct. 67, 97 L.Ed. 54 (1952).
AFFIRMED.

. Hearings before the Subcomm. on Tele-comms, Consumer Protection, and Finance of the H. Comm. on Energy and Commerce on H.R. 3238 and H.R. 2774, 97th Cong. (1981) *1196 (hereinafter "H. Hgs.”). H.R. 3238 (“The Public Broadcasting Amendments Act of 1981”) was passed by the House, but § 399a and § 399b, along with the rest of the Public Broadcasting Amendments Act of 1981, were enacted as part of the Omnibus Budget Reconciliation Act of 1981. Pub.L. No. 97-35, 95 Stat. 357 (1981). We look to the legislative history of H.R. 3238 for the record before Congress when it enacted § 399b.

. There were two minor differences between the FCC's framework and the enacted statutes. The FCC prohibited all goods and services advertising for which consideration was received, but § 399b prohibits such advertising by for-profit entities only. Section 399a also differs somewhat from the FCC’s treatment of donor acknowledgments. 90 F.C.C.2d at 901-02.

. In transferring the case, we cited 47 U.S.C. § 504(a) and Dougan v. FCC, 21 F.3d 1488, 1490-91 (9th Cir.1994), in which we held that “ § 504(a) vests exclusive jurisdiction in the district courts to hear enforcement suits by the government and suits by private individuals seeking to avoid enforcement.” Id. (emphasis added).

. Minority TV did not appeal the district court’s dismissal of its claims regarding the notice and the forfeiture order.

. We acknowledge that there has been considerable technological change in broadcasting, including the ubiquity of the Internet. However, a thoughtful examination of the impact of those changes on the use of broadcast spectrum, market segmentation, and the like can hardly occur on a record bare of evidence of the impact of technological change. Minority TV has offered nothing other than sound bite platitudes, and the dissent has offered nothing other than a series of newspaper articles, with the weight of such publications as ESPN Playbook and Variety.

. Speaking before the Senate on this Act, Senator Wirth stated that "[t]he marketplace has simply failed to produce [educational children's programming] on its own, in large part because the advertiser-driven television indus *1202 try does not find children’s programming to be a particularly lucrative venture” and that "educational [children’s] programs have literally disappeared from the airwaves on all but PBS stations.” 136 Cong. Rec. 18241-18242 (daily ed. July 19, 1990).

. Some NCE stations devote more than 40 percent of their weekday program hours to children's programming.

. According to Roger Noll, "the regulatory approach — improving the content of programs by writing content rules — is not as effective as simply removing the commercial incentive by eliminating advertising and subsidizing the right kind of programs.” For example, the poor outcomes of efforts to mandate educational and informational children’s programming on commercial stations evidence the weakness of a content regulation approach.

. The Commission obtained agreements to freeze labor and copyright costs for the course of the experiment with the express assurance that such freezes would not constitute a precedent if limited advertising were later authorized.

. We are surprised by the dissent's effort to undermine the Commission's recommendation with selective excerpts from the Commission’s report. For example, the dissent picks up on language suggesting a possible increase in revenues. The Commission, however, specifically discounted reliance on data showing any increased revenue. The dissent also highlights opinion polls that "showed an increase in the number of subscribers who reported that they would continue to contribute;” in fact, the actual data reflected “[a] significant decline in average contribution per subscriber at advertising stations.” Moreover, the data showed reduced giving from large contributors. Likewise, the dissent ignores new costs to public broadcast stations that the Commission identified, including tax increases or complete loss of tax-exempt status that could result without section 399(b). The dissent's "evidence” does not withstand basic scrutiny.