**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MICHAEL M. SATO,
  *Plaintiff-Appellant*,

v.

ORANGE COUNTY DEPARTMENT OF
EDUCATION,
  *Defendant-Appellee.*

No. 15-56402

D.C. No.
8:15-cv-00311-
JLS-JCG

OPINION

Appeal from the United States District Court
for the Central District of California
Josephine L. Staton, District Judge, Presiding

Argued and Submitted February 16, 2017
Pasadena, California

Filed June 28, 2017

Before: Richard C. Tallman and N. Randy Smith, Circuit
Judges, and Stephen Joseph Murphy III,* District Judge.

Opinion by Judge Tallman

---

*The Honorable Stephen Joseph Murphy III, United States District Judge for the Eastern District of Michigan, sitting by designation.

**SUMMARY**[**]

**Civil Rights**

The panel affirmed the district court's dismissal of a lawsuit brought pursuant to 42 U.S.C. § 1983 and state law by a former employee of the Orange County Department of Education who alleged that his termination violated his Fourteenth Amendment substantive and procedural due process rights and constituted a breach of contract.

The district court found that the Orange County Department of Education, as an arm of the state, was immune from suit under the Eleventh Amendment. In affirming the district court, the panel rejected plaintiff's contention that California Assembly Bill 97, which streamlined public education financing and decentralized education governance, abrogated the holding in *Belanger v. Madera Unified School District*, 963 F.2d 248 (9th Cir. 1992), that California school districts are entitled to sovereign immunity.

Applying the factors set forth in *Mitchell v. Los Angeles Community College District*, 861 F.2d 198 (9th Cir. 1988), the panel held that California school districts and County Offices of Education remain arms of the state and continue to enjoy Eleventh Amendment immunity. The panel held that AB 97 reformed the financing and governance of California public schools in important ways, but it did not so fundamentally alter the relationship between Offices of

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Education and the state as to abrogate this court's decision in *Belanger*.

## COUNSEL

Douglas A. Ames (argued), Ames Law Office, Fountain Valley, California, for Plaintiff-Appellant.

Jeffrey P. Thompson (argued) and Gregory A. Wille, Declues Burkett & Thompson APC, Huntington Beach, California, for Defendant-Appellee.

## OPINION

TALLMAN, Circuit Judge:

In 2013, the California legislature enacted Assembly Bill 97 (AB 97), a massive reform package designed to streamline public education financing and decentralize education governance. 2013 Cal. Legis. Serv. ch. 47 (A.B. 97). This appeal asks us to consider whether AB 97 abrogated our decisions in *Belanger v. Madera Unified School District*, 963 F.2d 248 (9th Cir. 1992), and *Eaglesmith v. Ward*, 73 F.3d 857 (9th Cir. 1996), in which we held that California school districts and county offices of education (COEs) are "arms of the state" entitled to state sovereign immunity. We hold that the passage of AB 97 had no such effect. School districts and COEs in California remain arms of the state and cannot face suit.

I

Defendant Orange County Department of Education (OCDE) hired plaintiff Michael Sato as a Systems Database Architect in August 2014. Within a matter of weeks after Sato started working at OCDE, Sato's supervisors informed him that he would be terminated immediately. OCDE offered no explanation as to why Sato was being terminated, and Sato insisted that he had performed his duties satisfactorily during his brief period of probationary employment with OCDE. Before he was fired, Sato received no oral or written notice of his termination, and he was given no opportunity to be heard at a pre- or post-termination proceeding.

Sato sued OCDE for damages in federal district court, asserting claims under 42 U.S.C. § 1983 and state law. In his complaint, Sato alleged that, under his employment contract with OCDE, Sato could only be fired for cause, even during his initial one-year probationary period.[1] Sato claimed that his termination without prior notice or a pre- or post-termination hearing therefore violated his Fourteenth

---

[1] Sato alleged that the terms of his employment contract were contained in OCDE's Management Employee Guidelines. The operative version of the Guidelines provided that "classified management employees," who are "employee[s] in a position not requiring certification under the California Education Code," may "be terminated during the probationary period for failing to meet the expectations of the job." *Orange Cty. Dep't of Educ.*, *Management Employee Guidelines* 3 (May 30, 2013). We assume without deciding that the Guidelines conferred a property interest in Sato's continued employment with OCDE.

Amendment substantive and procedural due process rights and constituted breach of contract.

OCDE moved to dismiss Sato's complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6),[2] arguing that, pursuant to our decision in *Belanger*, OCDE is an arm of the state and enjoys Eleventh Amendment immunity from suit.[3]  Sato responded that "the California Legislature's massive 2013 enactment of Assembly Bill 97 completely replaces the prior statutory basis for, and upends the analysis of, *Belanger*."  According to Sato, after the passage of AB 97, OCDE is no longer an arm of the state for sovereign immunity purposes.

The district court granted OCDE's Rule 12(b)(6) motion with respect to Sato's constitutional claims, but denied OCDE's motion with respect to the breach of contract

---

[2] A sovereign immunity defense is "quasi-jurisdictional" in nature and may be raised in either a Rule 12(b)(1) or 12(b)(6) motion.  *Compare Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir. 2015) ("Although sovereign immunity is only quasi-jurisdictional in nature, Rule 12(b)(1) is still a proper vehicle for invoking sovereign immunity from suit."), *with Eason v. Clark Cty. Sch. Dist.*, 303 F.3d 1137, 1140 (9th Cir. 2002) (deciding sovereign immunity question on appeal of the district court's grant of a Rule 12(b)(6) motion).

[3] We extended *Belanger*'s holding to California COEs, like OCDE, in *Eaglesmith v. Ward*, 73 F.3d 857, 860 (9th Cir. 1995).  COEs are county-level administrative units that provide operational support to school districts within their jurisdiction and also administer alternative schools, primarily for youth in the juvenile justice system.  *See* Legis. Analyst's Office, *How Are County Offices of Education (COEs) Funded Under the Local Control Funding Formula (LCFF)?* (Cal. 2014), *available at* http://www.lao.ca.gov/sections/education/ed-basics/How-Are-COEs-Funded-Under-the-LCFF.pdf.

claim.**[4]**   On the issue of sovereign immunity, the district court held that while the passage of AB 97 had perhaps decentralized state control over school funding and governance to some extent, Sato failed to show that AB 97 undermined our reasoning in *Belanger*.  Recognizing that OCDE's sovereign immunity defense applied equally to his federal and state claims, Sato then voluntarily dismissed his state breach of contract claim.    After granting Sato's voluntary dismissal motion, the district court entered final judgment in favor of OCDE.  We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## II

### A

We review the district court's grant of OCDE's Rule 12(b)(6) motion de novo, "accepting as true all well-pleaded allegations of fact in the complaint and construing them in the light most favorable to the plaintiffs." *Eason v. Clark Cty. Sch. Dist.*, 303 F.3d 1137, 1140 (9th Cir. 2002) (quoting *Zimmerman v. City of Oakland*, 255 F.3d 734, 737 (9th Cir. 2001)).  We also review de novo whether a party is entitled to Eleventh Amendment sovereign immunity.  *Id.*  "[A]n entity invoking Eleventh Amendment immunity bears the burden of asserting and proving those matters necessary to establish its defense." *Del Campo v. Kennedy*, 517 F.3d 1070, 1075 (9th Cir. 2008) (internal quotation mark omitted) (quoting *In re Lazar*, 237 F.3d 967, 974 (9th Cir. 2001)).

---

**[4]** The district court declined to dismiss Sato's breach of contract claim on sovereign immunity grounds because OCDE failed to raise sovereign immunity as a defense to that claim specifically.

Whether the passage of AB 97 abrogates our arm-of-the-state analysis in *Belanger* presents us with an issue of first impression. While we have applied *Belanger* and dismissed suits against California school districts since AB 97 was enacted, none of those cases considered AB 97's potential effects on *Belanger*. *See, e.g.*, *Davis v. Folsom Cordova Unified Sch. Dist.*, 674 F. App'x 699, 701 (9th Cir. 2017); *Chadam v. Palo Alto Unified Sch. Dist.*, 666 F. App'x 615, 618 (9th Cir. 2016); *Pierce v. Santa Maria Joint Union High Sch. Dist.*, 612 F. App'x 897, 898 (9th Cir. 2015); *C.W. v. Capistrano Unified Sch. Dist.*, 784 F.3d 1237, 1247 (9th Cir. 2015); *Brynjolfsson v. State Agency L.A. Unified Sch. Dist.*, 576 F. App'x 697, 698 (9th Cir. 2014). Because none of those cases raised the particular question that confronts us today, we are not bound by them. *Cf. Minority Television Project, Inc. v. FCC*, 736 F.3d 1192, 1211 (9th Cir. 2013) ("Courts 'are not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed sub silentio.'" (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952))).

B

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "It is well established that agencies of the state are immune under the Eleventh Amendment from private damages or suits for injunctive relief brought in federal court." *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1040 (9th Cir. 2003). State sovereign immunity does not extend to county and municipal governments, unless state law treats them as arms of the state. *Id.* at 1040–41. The

question before us is thus whether, after AB 97, OCDE "is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or instead is to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend." *See Holz v. Nenana City Pub. Sch. Dist.*, 347 F.3d 1176, 1180 (9th Cir. 2003) (internal quotation mark omitted) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)).

To determine whether a government entity is an arm of the state, we examine the five factors set forth in *Mitchell v. Los Angeles Community College District*, 861 F.2d 198 (9th Cir. 1988):

> [1] whether a money judgment would be satisfied out of state funds, [2] whether the entity performs central government functions, [3] whether the entity may sue or be sued, [4] whether the entity has the power to take property in its own name or only the name of the state, and [5] the corporate status of the entity.

*Belanger*, 963 F.2d at 250–51 (quoting *Mitchell*, 861 F.2d at 201).  We apply these factors to the question at hand.

AB 97 reformed education funding and governance in California in two key respects.  First, it replaced the old mechanism by which the state funded public education, which relied on a combination of "revenue limits" funding and "categorical funding grants," with the Local Control Funding Formula (LCFF).  The LCFF streamlined the number of state funding sources and increased K-12 spending, particularly for low-income and English-language-learner (ELL) student populations.  Second, AB 97

required that school districts and COEs develop Local Control and Accountability Plans (LCAPs) to measure progress toward state and district goals for student achievement.

Under the *Mitchell* factors, we conclude that AB 97 did not upend *Belanger* and *Eaglesmith*, and we affirm dismissal of Sato's complaint.

1

The first *Mitchell* factor—whether a money judgment against the government entity would be satisfied out of state funds—is the most important. *Eason*, 303 F.3d at 1141; *see also Savage*, 343 F.3d at 1041 ("Because the impetus of the Eleventh Amendment is the prevention of federal-court judgments that must be paid out of a state's treasury, '[t]he vulnerability of the State's purse [is] the most salient factor in Eleventh Amendment determinations.'" (alterations in original) (quoting *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994))). In evaluating this factor, "the relevant inquiry is whether [the state] will be legally required to satisfy any monetary judgment obtained against the [d]istrict," not whether state funds will actually be used. *Eason*, 303 F.3d at 1142; *see also Holz*, 347 F.3d at 1182 (finding the first *Mitchell* factor disfavored immunity for the defendant school district, even though the district received 98% of its funding from the state, because Alaska law disclaimed the state's responsibility for school district debts).

In *Belanger*, we explained that California's unique revenue limits system resulted in the state's legal liability for judgments against school districts. 963 F.2d at 252. Under

this system, state law established a maximum per-pupil[5] spending amount, equalized across school districts. *Id.* The state computed the "revenue limit" for each school district by multiplying the statutory per-pupil funding allotment by the number of students in that district. *Id.* To ensure districts and COEs were funded to the revenue limit, the state subtracted the value of local property taxes from the revenue limit and contributed the remaining amount. *Id.* (citing Cal. Educ. Code §§ 41600–41610, 42238–42251 (1992)). Administering this funding scheme meant that "state and local revenue [was] commingled in a single fund under state control." *Id.* And because revenue limits established a maximum, equalized funding level,

> local tax revenue lost to a judgment [had to] be supplanted by the interchangeable state funds already in the district budget. Any local funds withdrawn from the budget to pay a judgment [were] unavailable for educational purposes, and state funds in the budget must cover any critical educational expenses that the local funds would have covered absent the judgment.

*Id.* In other words, to guarantee that districts and COEs were funded at the statutory revenue limit, the state would be required to backfill any outlay of funds used to satisfy a judgment against a district or COE. Revenue limits thus had

---

[5] Many California statutes calculate school district and COE funding on an "average daily attendance" basis, *see, e.g.*, Cal. Educ. Code. §§ 2574(a)(3), 42238.02(d), which approximates a per-pupil basis, *Serrano v. Priest* (*Serrano I*), 487 P.2d 1241, 1246 n.4 (Cal. 1971). We use "per pupil" or "per student" instead of "average daily attendance" for simplicity.

the effect of making the state legally liable for any judgment against a school district.

Outside of California, in states that set a minimum, rather than a maximum, per-pupil funding amount, we have found that the first *Mitchell* factor disfavors immunity for school districts. *See, e.g.*, *Holz*, 347 F.3d at 1184 (Alaska); *Savage*, 343 F.3d at 1044 (Arizona); *Eason*, 303 F.3d at 1143 (Nevada). In Alaska and Nevada, for example, the state guarantees minimum funding for school districts—called the "basic support guarantee" in Nevada and the "basic need" in Alaska—and school districts are free to raise additional revenue beyond that amount. *Holz*, 347 F.3d at 1183–84; *Eason*, 303 F.3d at 1142–43. Because per-pupil spending need not be equalized across districts, we held it was "not necessarily true that an amount withdrawn from a school district's account in order to pay a judgment will be replaced with state money." *Holz*, 348 F.3d at 1184 (quoting *Eason*, 303 F.3d at 1143). Similarly, in *Savage*, we held the state of Arizona would not be liable for judgments against school districts, as districts' funds "are not subject to state control, are not subject to a *Belanger*-style spending-cap, and will not be replenished with money out of the state treasury." 343 F.3d at 1044.

Sato argues that when AB 97 replaced revenue limits with the LCFF, it replaced a maximum per-pupil funding formula with a minimum per-pupil formula. According to Sato, school districts and COEs in California, like those in Alaska, Arizona, and Nevada, are now free to raise local property tax revenues as much as they want to supplement minimum state support.

We find Sato's arguments without merit. As we noted in *Belanger*, equalization of per-pupil spending in California is not simply a matter of policy, but of state constitutional law.

963 F.2d at 251. In two decisions from the 1970s—*Serrano v. Priest* (*Serrano I*), 487 P.2d 1241 (Cal. 1971), and *Serrano v. Priest* (*Serrano II*), 557 P.2d. 929 (Cal. 1976)—the California Supreme Court declared that disparities in per-pupil spending, driven by differences in districts' ability to generate local property tax revenues, violated the equal protection guarantees of the state constitution. *Serrano II*, 557 P.2d at 957–58; *Serrano I*, 487 P.2d at 1263. Nowhere in AB 97 does the California legislature attempt to amend the state constitution's equal protection provisions, and thus we assume that the constitutional precepts announced in *Serrano I* and *Serrano II* remain good law. *See Methodist Hosp. of Sacramento v. Saylor*, 488 P.2d 161, 164–65 (Cal. 1971) ("Unlike the federal Constitution, which is a grant of power to Congress, the California Constitution is a limitation or restriction on the powers of the Legislature.").

Even putting state constitutional issues aside, Sato's characterization of the LCFF as a minimum per-pupil funding formula is at odds with the text of AB 97, which demonstrates the legislature's intent to maintain equalization of per-pupil spending. Under the LCFF, districts and COEs receive a "base grant" amount for each student, and they may receive additional "supplemental grant" and "concentration grant" funding depending on the number of low-income and ELL students.[6] Cal. Educ. Code § 2574(b)–(c) (COEs); *id.* § 42238.02(b)–(f) (districts). Supplemental grants provide school districts with additional funding equal to 20% of the base grant for each low-income or ELL student in the

---

[6] For COEs, base grants, supplemental grants, and concentration grants support alternative public schools operated by COEs. Cal. Educ. Code § 2574(c). COEs also receive operational grants, which fund the services that COEs provide to school districts within their jurisdiction. *Id.* § 2574(a).

district; concentration grants provide an additional 50% of the base grant amount for each low-income or ELL student, if the proportion of low-income/ELL students exceeds 55% of total enrollment. *Id.* § 42238.02(e)–(f).

As explained by the California Legislative Analyst's Office, the combination of base, supplemental, and concentration grants ensures that "[d]istricts serving the same number of students in the same grade spans with the same characteristics receive the same amount of funding."[7] Moreover, the state calculates its funding share to districts and COEs in the same manner as under the revenue limits system: the state's contribution is equal to the state-determined LCFF funding target minus local property tax revenue. Cal. Educ. Code §§ 2575, 42238.02(j). The legislature's use of the same state contribution equation indicates that the LCFF funding target, like a revenue limit, represents a maximum expenditure, not a minimum.

Sato contends that the legislature's use of the term "base grant" evinces its intent to allow districts and COEs to raise local property tax revenues above and beyond the state's minimum "base" support. He also alleges that OCDE receives a significant portion of its funding from local property tax revenues, which he claims are raised on top of LCFF base grant funding. But Sato's focus on semantics ignores the strictures of the California Constitution expressed in *Serrano I* and *Serrano II*. And there is nothing unusual about the fact that OCDE receives some of its funding from local tax dollars. As under the revenue limits

---

[7] Legis. Analyst's Office, *Local Control Funding Formula Implementation* 1 (Cal. 2015), *available at* http://www.lao.ca.gov/hand outs/education/2015/Local-Control-Funding-Formula-Implementation-031915.pdf.

system, school districts and COEs are funded through a combination of local tax revenues and the state's funding contribution.  *See* Cal. Educ. Code.  § 42238.02; *Belanger*, 963 F.2d at 252.

Examining the purposes of AB 97, we find no intent on the part of the California legislature to replace a maximum per-pupil funding formula with a minimum per-pupil formula.  Rather, the legislation's objectives were twofold: (1) increase education funding,[8] particularly for low-income and ELL students, and (2) simplify what many considered an "overly complex, inefficient, and outdated" education finance system.[9]   To achieve these ends, the LCFF streamlined the numerous, piecemeal sources of state funding under the old revenue limits system.  Base grants, supplemental grants, and concentration grants replaced revenue limits funding and almost all of the dozens of categorical funding grants under the old funding mechanism. Taylor, *supra* note 8, at 6, 7 fig.5 (listing 32 categorical funding programs eliminated under the LCFF).  Categorical grants were restricted funds used for dozens of school services, such as special education, educational technology, and principal training.  Now, instead of receiving many types of restricted funds, districts and COEs receive larger lump sums, with more flexibility over how state dollars are spent. *See Campaign for Quality Educ. v. State*, 209 Cal. Rptr. 3d

---

[8] The LCFF increases per-pupil funding amounts compared to revenue limits per-pupil spending and provides for a complex transition formula to bring per-pupil spending up to target levels over several years. Cal. Educ. Code § 42238.03; *see also* Mac Taylor, Legis. Analyst's Office, *Updated: An Overview of the Local Control Funding Formula* 2–3 (Cal. 2013), *available at* http://www.lao.ca.gov/reports/2013/edu/lcff/lcff-072913.pdf.

[9] Taylor, *supra* note 8, at 20.

888, 923 (Cal. Ct. App. 2016) (Liu, J., dissenting from denial of petition for review) (describing the LCFF as "designed to improve the ability of school districts to flexibly use state education dollars to address the most pressing areas of need").

While the passage of AB 97 provided districts and COEs with additional flexibility in their budgets, we note, however, that AB 97 did not eliminate the "centralized" system of "strict state control" over local districts' funding we discussed in *Belanger*. *See* 963 F.2d at 252. In *Belanger*, we noted that the enactment of Proposition 13 by statewide ballot initiative in 1978 "ensured that the state, rather than local school districts, would control funding for public schools." *Id.* at 251. Proposition 13 capped local property tax rates at 1% of assessed value, and transferred the authority to collect and redistribute local property tax revenues to the state. Cal. Const. art. XIIIA, § 1(a). As the California Supreme Court explained:

> [B]y capping local property tax revenue, [Proposition 13] greatly enhanced the responsibility the state would bear in funding government services, especially education. [And] by failing to specify a method of allocation, Proposition 13 largely transferred control over local government finances . . . to the state, converting the property tax from a nominally local tax to a de facto state-administered tax subject to a complex system of intergovernmental grants.

*Cal. Redev. Ass'n v. Matosantos*, 267 P.3d 580, 589 (Cal. 2011) (citations omitted). AB 97 did nothing to override

Proposition 13, and Sato does not dispute that Proposition 13 remains in effect.

In sum, we find that AB 97 left in place the fundamental elements of *Belanger*:  equalization of per-pupil spending and centralized control over local education budgets. Because the LCFF keeps in place a maximum per-pupil funding formula, state and local funds are still "hopelessly intertwined," and "any change in the allocation of property tax revenue has a direct effect on the allocation of state funds." *Belanger*, 963 F.2d at 252.  The first *Mitchell* factor therefore weighs in favor of Eleventh Amendment immunity.

2

The second *Mitchell* factor asks us to consider "whether the [government] entity performs central government functions." *Mitchell*, 861 F.2d at 201.  In *Belanger*, we found that "California law treats public schooling as a statewide or central governmental function."  963 F.2d at 253.  The California Supreme Court has said that "[s]ince its admission to the Union, California has assumed specific responsibility for a statewide public education system open on equal terms to all." *Butt v. State*, 842 P.2d 1240, 1247 (Cal. 1992).  Examples of the state's assumption of public education as a state responsibility appear throughout the California Constitution. *See, e.g.*, Cal. Const. art. IX, § 5 ("The Legislature shall provide for a system of common schools."); Cal. Const. art. XVI, § 8(a) ("From all state revenues there shall first be set apart the moneys to be applied by the State for support of the public school system and public institutions of higher education.").

Sato argues that AB 97's requirement that school districts and COEs adopt Local Control and Accountability

Plans (LCAPs) "unequivocally establish[es] that California public schooling is now controlled and provided locally." We disagree.

LCAPs are three-year plans that must describe districts' goals for student achievement and identify actions districts will take to meet those goals. Cal. Educ. Code § 52060; Taylor, *supra* note 8, at 8. LCAPs must address eight areas of state priority, and they may also include "additional local priorities identified by the governing board of the school district" or county board of education. Cal. Educ. Code §§ 52060(c)–(d), 52066(c)–(d). Within these areas, districts and COEs must set goals for all students and for specific subgroups of students, including ethnic minorities, low-income students, ELL students, and students with disabilities. *Id.* §§ 52052(a), 52060(c), 52066(c). LCAPs must be developed using a state-provided template. *Id.* §§ 52060(a), 52066(a). Within five days of adopting or updating its LCAP, a district must submit its LCAP to its COE for review, *id.* § 52070(a), and the COE is then responsible for filing the LCAP with the state, *id.* § 52070.5.

Sato argues that, in empowering districts to identify local priorities and develop strategies for achieving their goals through the LCAP process, AB 97 effectively transferred primary authority over public education from the state to the local level. We are unconvinced that LCAPs represent such a sea change. Under the state constitution, the provision of public education in California remains a central government function. And even through the LCAP process, the state still exercises significant control over school districts and COEs. Under the LCAP provisions of AB 97, districts and COEs "shall" address eight areas of priority identified by the state, and "may" also address local priorities. Cal. Educ. Code §§ 52060(c), (h), 52066(c), (h). The far-reaching areas of

state priority include such fundamental issues as "[i]mplementation of the academic content and performance standards adopted by the state board," "[p]arental involvement," and "[p]upil achievement." *Id.* § 52060(d). For each area of state priority, districts and COEs must set goals for state-identified subgroups of students, and they must use state-provided templates and submit the final LCAP to the California Department of Education.

On the whole, AB 97 granted districts and COEs some measure of autonomy and discretion in goal-setting, but it did not delegate primary responsibility for providing public education. We therefore find that the passage of AB 97 did not disturb our longstanding precedent that "California law treats public schooling as a statewide or central governmental function." *See Belanger*, 963 F.2d at 253. As in *Belanger*, "[t]hat the state itself has decided to give its local agents more autonomy does not change the fact that the school districts remain state agents under state control." *Id.* The second *Mitchell* factor weighs in favor of Eleventh Amendment immunity for OCDE.

3

The passage of AB 97 does not impact our analysis of the remaining three *Mitchell* factors. As in *Belanger*, the third *Mitchell* factor—whether the government entity may sue or be sued—weighs in Sato's favor. *See Belanger*, 963 F.2d at 254. Under California law, COEs and school districts can sue and be sued in their own name. Cal. Educ. Code § 35162 ("In the name by which the district is designated the governing board may sue and be sued, and hold and convey property for the use and benefit of the school district."). Accordingly, this factor "militates against a finding of Eleventh Amendment immunity." *Belanger*, 963 F.2d at 254. But as we recognized in *Belanger*, "it does

not necessarily follow that the school district can be sued for money damages just because it can be sued in its own name." *Id.* We therefore adopt *Belanger*'s approach in finding that this factor weighs in Sato's favor, but we afford it less weight than the first two factors. *See id.*

4

The fourth *Mitchell* factor also weighs in Sato's favor. The fourth factor considers "whether the entity has the power to take property in its own name or only the name of the state." *Mitchell*, 861 F.2d at 201. In California, the same statute that allows COEs and school districts to sue and be sued in their own name also conveys to COEs and school districts the power to hold property in their own name. Cal. Educ. Code § 35162. Critically, however, the California Supreme Court has determined that local public school entities hold property for the benefit of the state. *Hall v. City of Taft*, 302 P.2d 574, 577 (Cal. 1956) ("The beneficial ownership of property of the public schools is in the state."). We thus concluded in *Belanger* that this factor was a "close question" entitled to "little weight." 963 F.2d at 254. We reiterate that conclusion here.

5

The fifth *Mitchell* factor asks us to consider the corporate status of OCDE. In California, "school districts have the corporate status of agents of the state for purposes of school administration." *Eason*, 303 F.3d at 1144 (quoting *Belanger*, 963 F.2d at 254). The California Supreme Court has stated that "[l]ocal districts are the State's agents for local operation of the common school system." *Butt*, 842 P.2d at 1248.

Sato contends that COEs must be a distinct corporate entity from the state, because OCDE sued the state of California in *Orange County Department of Education v. California Department of Education*, 668 F.3d 1052 (9th Cir. 2011). As we have already determined, however, California law previously authorized school districts and COEs to sue in their own name before the passage of AB 97. Cal. Educ. Code § 35162. This limited authority does not change the status of districts and COEs as agents of the state. This factor weighs in favor of Eleventh Amendment immunity.

## III

Considering all of the *Mitchell* factors together, we hold that California school districts and COEs, including defendant OCDE, remain arms of the state and continue to enjoy Eleventh Amendment immunity. AB 97 reformed the financing and governance of California public schools in important ways, but it did not so fundamentally alter the relationship between COEs and the state as to abrogate our decision in *Belanger*. Sato's claims against OCDE were properly dismissed.

**AFFIRMED.**  Each party shall bear its own costs.