TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

ROB BONTA
Attorney General

_____

|  |  |  |
|---|---|---|
| OPINION | : | |
| | : | No. 23-902 |
| of | : | |
| | : | April 25, 2024 |
| ROB BONTA | : | |
| Attorney General | : | |
| | : | |
| KARIM J. KENTFIELD | : | |
| Deputy Attorney General | : | |

The HONORABLE MARIE ALVARADO-GIL, MEMBER OF THE STATE SENATE, has requested an opinion on a question relating to state education funding.

**QUESTION PRESENTED AND CONCLUSION**

Under California's Local Control Funding Formula, or "LCFF," established by the Education Code, school districts and other local educational agencies receive supplemental funding based on the number of students they serve who qualify as "unduplicated pupils" under sections 42238.02 and 2574. May the Legislature expand the statutory definition of "unduplicated pupil" to provide supplemental funding for all members of the pupil subgroup that had the lowest performance on the most recently available statewide assessment exams? The pupil subgroups that would be eligible for this supplemental funding would be only those subgroups identified in Education Code section 52052(a)(2) that do not already receive supplemental funding through the LCFF or other state or federal resources.

No, the Legislature may not amend the LCFF statute in the specified manner. The only pupil subgroups listed in section 52052(a)(2) that do not already receive supplemental state or federal funding are what the statute calls the "ethnic subgroups"— which consist of students identifying as Black or African American, American Indian or Alaska Native, Asian, Filipino, Hispanic or Latino, Native Hawaiian or Pacific Islander,

1

23-902

White, or two or more races.  The purpose and effect of the legislative proposal is therefore to identify the ethnic subgroup of students with the lowest average performance on the most recent statewide exams, and then provide supplemental funding for all students in that ethnic subgroup, including students with high individual test scores.  By conditioning state education funding on student ethnicity, regardless of individual performance, the proposal would violate the federal Constitution.

## BACKGROUND

In 2013, the Legislature "fundamentally changed how all local educational agencies . . . in the state are funded."[1]  It established the Local Control Funding Formula, which "streamlined the number of state funding sources and increased K-12 spending."[2]  The LCFF assigns a funding target to each California school district, charter school, and county office of education.  Each educational agency then receives funding at or above its target through a combination of state aid and local property taxes.[3]

Education Code sections 42238.02 and 2574 provide detailed rules for calculating each agency's funding target.  We will describe the calculation for school districts, which is representative of the calculation for all educational agencies.  First, school districts receive a "grade span adjusted base grant."[4]  The base grant is calculated as a fixed dollar amount per student, adjusted for average daily attendance.[5]

Districts then receive additional funding for students classified as "unduplicated pupils," which the statute defines as three categories of students:  English learners; students eligible for a free or reduced-price meal; and foster youth.[6]  For each unduplicated pupil, a school district receives a "supplemental grant" equal to a percentage of its base grant.[7]  If unduplicated pupils exceed 55 percent of the student population, then the district also receives a "concentration grant" for each unduplicated

---

[1] Cal. Dept. of Education, Local Control Funding Formula, LCFF Overview, https://www.cde.ca.gov/fg/aa/lc/ (as of Apr. 22, 2024).

[2] *Sato v. Orange Cnty. Dep't of Educ.* (9th. Cir. 2017) 861 F.3d 923, 929.

[3] See Cal. Dept. of Education, LCFF Frequently Asked Questions, https://www.cde.ca.gov/FG/aa/lc/lcfffaq.asp (as of Apr. 22, 2024).

[4] See Educ. Code, § 42238.02, subd. (d).

[5] See Educ. Code, § 42238.02, subds. (d), (i).

[6] Educ. Code, § 42238.02, subd. (b)(1); see *id.*, § 2574, subd. (b)(2); see also *id.*, § 42238.01 (defining each category in more detail).

[7] Educ. Code, § 42238.02, subd. (e); see *id.*, § 2574, subd. (c)(2).

23-902

pupil above that threshold.[8]  School districts must spend supplemental and concentration grants "to increase or improve services for unduplicated pupils as compared to the services provided to all pupils."[9]  Although districts may spend the funds on district-wide services, they must document how the funded "services are principally directed towards, and are effective in, meeting the district's goals for its unduplicated pupils."[10]

Under state law, student performance must be regularly assessed.  Relevant here, section 52052 requires school districts, charter schools, and county offices of education to measure average student performance on standardized exams for the following "pupil subgroups":  English learners, socioeconomically disadvantaged pupils, foster youth, homeless youth, pupils with disabilities, and "ethnic subgroups."[11]  Under California Department of Education guidelines, the ethnic subgroups consist of students identifying as Black or African American, American Indian or Alaska Native, Asian, Filipino, Hispanic or Latino, Native Hawaiian or Pacific Islander, White, or two or more races.[12]

## ANALYSIS

This request asks whether the Legislature could amend the LCFF definition of "unduplicated pupil" to add a fourth category of students eligible for supplemental funding.  The new category would consist of all members of the section 52052 pupil subgroup that had the lowest performance on the most recent statewide assessment exams.  The proposal specifies that any section 52052 pupil subgroup that already receives supplemental funding—through the LCFF or any other state or federal resources—would be ineligible for the proposal's additional funding.  Because the five non-ethnic subgroups enumerated in section 52052 all receive supplemental funding under existing state or federal law, the only pupil subgroup that could be selected to receive supplemental funding under this proposal would be one of the ethnic subgroups.[13]

---

[8] Educ. Code, § 42238.02, subd. (f); see *id.*, § 2574, subd. (c)(3).

[9] Cal. Code Regs., tit. 5, § 15496, subd. (a).

[10] Cal. Code Regs., tit. 5, § 15496, subd. (b)(1)(B), (2)(B).

[11] Educ. Code, § 52052, subd. (a)(1), (2)(A)-(F), capitalization omitted.

[12] See Cal. Dept. of Education, FAQs—Race and Ethnicity Collection and Reporting, https://www.cde.ca.gov/ds/sp/cl/refaq.asp (as of Apr. 22, 2024).

[13] As noted, section 52052 enumerates five non-ethnic subgroups:  English learners, socioeconomically disadvantaged pupils, foster youth, homeless youth, and pupils with disabilities.  (See Educ. Code, § 52052, subd. (a)(2)(B)-(F).)  The first three subgroups are already defined as unduplicated pupils under the LCFF.  (See *id.*, § 42238.02, subd. (b)(1).)  Students experiencing homelessness also qualify as unduplicated pupils because they are eligible for a free or reduced-price meal.  (See Cal. Dept. of Education,

3

The proposal can therefore be re-stated as follows: it would expand the definition of "unduplicated pupil" to include all students in the ethnic subgroup that had the lowest average performance on the most recent statewide assessment exams.[14] For example, in the 2022-2023 academic year, the ethnic subgroup with the lowest average statewide test scores was Black or African American students.[15] If the proposal had been in effect that year, all Black students in the State would have been classified as unduplicated pupils, regardless of whether an individual Black student's test scores were low or high. Students with low individual test scores from other ethnic subgroups would not qualify on the basis of their ethnic subgroup affiliation (though they might still be counted as unduplicated pupils under the existing definition for other reasons, i.e., as English learners, students eligible for a free or reduced-price meal, or foster youth).

The requestor explains that the purpose of the proposal is to address the persistent racial achievement gaps in K-12 education in California. As the requestor notes, test scores for Black students lag statewide averages in both English and Mathematics. In the most recently reported data, for example, 70% of Black students did not meet English language standards, compared with 53% of all students who did not meet those standards.[16] Similar achievement gaps exist for students in other ethnic subgroups; for example, among students identifying as American Indian or Alaska Native, 66% did not meet English standards. And these achievement gaps persist whether students are low income or not.[17] To address these serious disparities, the proposal would classify all students in the lowest-performing ethnic subgroup—currently Black students—as unduplicated pupils, thereby triggering additional funding.[18] The requestor reports that

LCFF Frequently Asked Questions, https://www.cde.ca.gov/FG/aa/lc/lcfffaq.asp (as of Apr. 22, 2024); Educ. Code, § 42238.02, subd. (b)(1).) And students with disabilities receive supplemental funding through other resources. (See Cal. Dept. of Education, VII. Special Education Financing, https://www.cde.ca.gov/sp/se/sr/taskforce2015-financing.asp (as of Apr. 22, 2024).)

[14] See Educ. Code, § 52052, subd. (a)(2)(A).

[15] For ease of reference, we will refer to this subgroup as Black students.

[16] All testing statistics cited in this opinion were gathered from the California Department of Education's reporting tools. (See California Assessment of Student Performance and Progress, Test Results for California's Assessments, https://caaspp-elpac.ets.org/caaspp/Default (as of Apr. 22, 2024); California School Dashboard, https://www.caschooldashboard.org/reports/ca/2023 (as of Apr. 22, 2024).)

[17] For example, among students who are not economically disadvantaged, 34% did not meet English language standards, compared with 53% of Black students and 50% of American Indian or Alaska Native students who are not economically disadvantaged.

[18] Although the request letter focuses on the achievement gap for Black students, the

4

75% of Black students currently qualify as unduplicated pupils under the existing statutory definition, so the proposal would affect the remaining 25%.[19]

We have been asked to analyze whether this legislative proposal would run afoul of the state or federal Constitution. In doing so, we recognize the critical importance of the problem that this proposal seeks to address. As commentators have observed, "[f]ew goals in education have been as frustrating and urgent as the effort to fix the deep, generational disparity in achievement . . . in California schools."[20] The persistence of a racial achievement gap across "cities, rural communities and suburbs" is "a sign that opportunity is not yet equal for many children in California classrooms."[21]

We also recognize, however, that recent decisions of the United States Supreme Court have increasingly constrained the ability of government to factor race or ethnicity into policymaking. Applying those precedents here, we conclude that the proposed amendment would violate the federal Constitution by conditioning education funding on student ethnicity. Because we conclude that the proposal would violate federal law, we need not address whether it would also violate the state Constitution.[22]

---

lowest-performing ethnic subgroup could change in future years.

[19] See Senator Marie Alvarado-Gil, letter to Senior Assistant Att'y Gen., Marc J. Nolan, Sept. 18, 2023, at p. 2.

[20] Cal Matters, Mind the achievement gap: California's disparities in education, explained, https://calmatters.org/explainers/achievement-gap-california-explainer-schools-education-disparities-explained (as of Apr. 22, 2024); see also California Task Force to Study and Develop Reparation Proposals for African Americans, Final Report, at p. 267, https://oag.ca.gov/system/files/media/full-ca-reparations.pdf (as of Apr. 22, 2024) (Reparations Report) (describing the "harmful intergenerational effects" of racial disparities in student opportunity and achievement).

[21] Cal Matters, Mind the achievement gap: California's disparities in education, explained, *supra*. A recent state task force thoughtfully examined the role of the State and the federal government in contributing to present-day educational inequality. (See Reparations Report, *supra*, at pp. 240-281.) From the operation of expressly segregated schools to the enactment of discriminatory residential settlement policies, the report documents how governments at all levels contributed to enduring disparities in educational outcomes.

[22] See, e.g., Cal. Const., art. I, § 7, subd. (a) ("A person may not be . . . denied equal protection of the laws"); *id.*, art. I, § 31, subd. (a) (under Proposition 209, the "State shall not . . . grant preferential treatment to . . . any individual or group on the basis of race . . . [or] ethnicity . . . in the operation of . . . public education").

23-902

**The Legislative Proposal Would Violate The Federal Equal Protection Clause.**

The United States Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."[23] A "core purpose" of the equal protection clause is to "do away with all governmentally imposed discrimination based on race."[24] In the education context, the government may not "separat[e] students on the basis of race without an exceedingly persuasive justification."[25]

Under United States Supreme Court precedent, "all racial classifications imposed by" a State "must be analyzed . . . under strict scrutiny."[26] As the Court has explained, strict scrutiny is the "most rigorous and exacting standard of constitutional review."[27] First, a court asks "whether the racial classification is used to further compelling governmental interests."[28] If so, then the court asks "whether the government's use of race is 'narrowly tailored'—meaning necessary—to achieve that interest."[29] Applying that standard, the Supreme Court has invalidated race-conscious programs in areas such as government contracting and K-12 school assignments.[30] Most recently, it struck down a university admissions policy that considered race as one factor in a holistic review of applications—despite having repeatedly upheld similar policies before, including less than a decade earlier.[31]

---

[23] U.S. Const., 14th Amend., § 1.

[24] *Palmore v. Sidoti* (1984) 466 U.S. 429, 432.

[25] *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* (2023) 600 U.S. 181, 217.

[26] *Johnson v. California* (2005) 543 U.S. 499, 505, italics, internal quotation marks, and alterations omitted.

[27] *Miller v. Johnson* (1995) 515 U.S. 900, 920.

[28] *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, *supra*, 600 U.S. at pp. 206-207, internal quotation marks omitted.

[29] *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, *supra*, 600 U.S. at p. 207, internal quotation marks omitted.

[30] See, e.g., *City of Richmond v. J.A. Croson Co.* (1989) 488 U.S. 469; *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1* (2007) 551 U.S. 701.

[31] Compare *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, *supra*, 600 U.S. at p. 230 (invalidating race-conscious admissions policy), with *Fisher v. Univ. of Texas at Austin* (2016) 579 U.S. 365 (upholding similar policy), and *Grutter v. Bollinger* (2003) 539 U.S. 306 (same).

23-902

We recognize that dissenting justices have frequently criticized the Court's modern approach in this area. Justice Sotomayor, for example, argued that the Court's recent invalidation of a race-conscious university admissions plan "subverts the constitutional guarantee of equal protection" by "cement[ing] a superficial rule of colorblindness as a constitutional principle in an endemically segregated society where race has always mattered and continues to matter."[32] In light of our obligation to apply governing precedent, however, our analysis must rely on the Court's majority decisions.

Applying those decisions, we conclude that the proposed LCFF amendment "must be analyzed . . . under strict scrutiny."[33] As explained above, the proposal would allocate supplemental education funds based on student ethnicity. Using 2022-2023 data, for example, the proposal is no different from one defining "unduplicated pupil" for that year to include "all Black students in the State." Although the lowest-performing subgroup could change in later years, supplemental funding would always be awarded to a single ethnic group. Because the proposal would "distribute[] . . . benefits on the basis of individual racial classifications," it must be "reviewed under strict scrutiny."[34]

Applying that standard, we first consider whether the proposed policy would "further compelling governmental interests."[35] In the context of K-12 education, the Supreme Court has recognized that the State has a "compelling" interest in remedying the effects of "past discrimination that violated the Constitution or a statute."[36] In contrast,

---

[32] *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, *supra*, 600 U.S. at p. 318 (dis. opn. of Sotomayor, J.); see also, e.g., *Gratz v. Bollinger* (2003) 539 U.S. 244, 304 (dis. opn. of Ginsburg, J.) ("The stain of generations of racial oppression is still visible in our society, . . . and the determination to hasten its removal remains vital"); *City of Richmond v. J.A. Croson Co.*, *supra*, 488 U.S. at pp. 529-530 (dis. opn. of Marshall, J.) (preventing "governmental entities . . . from acting to rectify the scourge of past discrimination . . . is not the Constitution's command").

[33] *Johnson v. California*, *supra*, 543 U.S. at p. 505.

[34] *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, *supra*, 551 U.S. at p. 720; see also *Johnson v. California*, *supra*, 543 U.S. at p. 505 ("We have insisted on strict scrutiny in every context, even for so-called 'benign' racial classifications, such as race-conscious university admissions policies, [and] race-based preferences in government contracts" citations omitted).

[35] *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, *supra*, 600 U.S. at pp. 206-207, internal quotation marks omitted.

[36] *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, *supra*, 600 U.S. at p. 207; see, e.g., *Hernandez v. Bd. of Educ.* (2004) 126 Cal.App.4th 1161 (school district's prior operation of racially segregated schools had justified race-conscious remedial integration policies). The requestor has not identified past discrimination as a

23-902

the Court has "held that ameliorating societal discrimination does not constitute a compelling interest that justifies race-based state action."[37]

The stated purpose of the proposed LCFF amendment is to improve educational outcomes for the State's lowest-performing students, thereby addressing the persistent racial achievement gap in K-12 education.[38] In our view, the State's interest in improving academic outcomes for underperforming students is a vital objective. As the U.S. Supreme Court has long recognized, "education is perhaps the most important function of state and local governments."[39] By "provid[ing] the basic tools by which individuals might lead economically productive lives," education plays "a fundamental role in maintaining the fabric of our society."[40] Indeed, "it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education."[41] Recent analyses have only reaffirmed that conclusion.[42] And like other state interests that have been recognized as "compelling," there are clear standards for "courts . . . to measure" improvements in student performance, including scores on standardized statewide assessment exams.[43] For these reasons, we conclude that improving educational outcomes for low-performing students is a "compelling" interest for federal equal protection purposes.

---

justification for the legislative proposal here.

[37] *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, *supra*, 600 U.S. at p. 226.

[38] See *ante*, fns. 16-17.

[39] *Brown v. Bd. of Educ.* (1954) 347 U.S. 483, 493.

[40] *Plyler v. Doe* (1982) 457 U.S. 202, 221; see *ibid.* (emphasizing "the importance of education in maintaining our basic institutions, and the lasting impact of its deprivation on the life of the child").

[41] *Brown v. Bd. of Educ.*, *supra*, 347 U.S. at p. 493.

[42] See, e.g., U.S. Dep't of the Treasury, Office of Economic Policy, Racial Differences in Educational Experiences and Attainment (June 9, 2023), https://home.treasury.gov/news/featured-stories/post-5-racial-differences-in-educational-experiences-and-attainment (as of Apr. 22, 2024) (emphasizing the adverse life-long consequences of "[r]acial differences in childhood educational experiences"); see also *ante*, fns. 20-21; cf. *Serrano v. Priest* (1976) 18 Cal.3d 728, 765-766 (recognizing education as a "fundamental interest" under state equal protection analysis).

[43] *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, *supra*, 600 U.S. at p. 214; see *id.* at p. 215 (describing standards for courts to evaluate other state interests recognized as "compelling").

Strict scrutiny also requires the State to show that its use of race is "narrowly tailored," that is, "necessary . . . to achieve" its compelling interest.[44] "Narrow tailoring requires serious, good faith consideration of workable race-neutral alternatives."[45] If such an alternative "could promote the [State's] interest about as well and at tolerable administrative expense," then the State generally "may not consider race."[46] The Supreme Court has emphasized, however, that narrow tailoring "does not require exhaustion of every conceivable race-neutral alternative."[47]

We conclude that the legislative proposal here is not "narrowly tailored" to advancing the State's interest in closing student achievement gaps. To begin with, there appears to be a "workable race-neutral alternative[]."[48] The Legislature could directly tie supplemental LCFF funding to low student performance by defining "unduplicated pupil" to include all students who score below a specified threshold on the statewide assessment exams. The State has implemented a program like this before: it allocated $300 million for low-performing students in the 2018-2019 fiscal year.[49] And this approach could advance the State's interest in improving academic outcomes for its lowest-performing students by directly identifying those students and funding services for them.

Moreover, as compared with the race-neutral alternative, the legislative proposal at issue is less precisely tailored to advancing the State's interest in funding services for low-scoring students.[50] Because the proposal limits supplemental funding to students in one ethnic subgroup, it fails to increase funding for the many students in other ethnic subgroups with significant educational needs. Using current data, for example, the

---

[44] *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, *supra*, 600 U.S. at p. 207, internal quotation marks omitted.

[45] *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, *supra*, 551 U.S. at p. 735, internal quotation marks omitted.

[46] *Fisher v. Univ. of Texas at Austin* (2013) 570 U.S. 297, 312, internal quotation marks omitted.

[47] *Grutter v. Bollinger*, *supra*, 539 U.S. at p. 339; cf. *Williams-Yulee v. Fla. Bar* (2015) 575 U.S. 433, 454 (to survive strict scrutiny in First Amendment challenge, state action must "be narrowly tailored, not . . . perfectly tailored," internal quotation marks omitted).

[48] *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, *supra*, 551 U.S. at p. 735.

[49] See Educ. Code, § 41570; Cal. Dept. of Education, Low-Performing Students Block Grant, https://www.cde.ca.gov/fg/aa/ca/lpsbg.asp (as of Apr. 22, 2024).

[50] Although test scores are only one metric for evaluating student performance, the proposal itself uses test scores to identify the highest-need students. We will therefore use the same metric to compare the proposal to the race-neutral alternative.

proposal would provide additional support for Black students, who make up approximately 6% of the State's low-performing student population. But it would provide no further support for students with low scores in other ethnic subgroups, who constitute about 94% of the low-performing students in the State.[51] In contrast, the race-neutral alternative would increase funding for all low-performing students, regardless of race or ethnicity. Further, although the identified state interest is to support low-performing students, the proposal would provide supplemental funding for some students who are already performing well: Black students with high individual test scores. In this respect, the proposal again contrasts with the race-neutral alternative, which would increase funding only for students with low individual test scores.

For these reasons, we conclude that the legislative proposal here would not survive the strict scrutiny analysis. Under governing precedent, the proposal is not "narrowly tailored" to advancing the State's compelling interest in improving educational outcomes for its low-performing students.[52]

## CONCLUSION

We conclude that the proposed legislative amendment would violate the federal equal protection clause. Nothing in this opinion calls into question race-conscious state or local policies that are "narrowly tailored" to advancing a compelling state interest, such as remediating the effects of past government discrimination. Nor does it cast any doubt on the legality of education-funding mechanisms that do not rely on express racial or ethnic classifications.

---

[51] See *Connerly v. State Pers. Bd.* (2001) 92 Cal.App.4th 16, 32 ("[P]ersons similarly situated with respect to the legitimate purpose of the law [must] receive like treatment").

[52] See *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, *supra*, 551 U.S. at p. 735; *Connerly v. State Pers. Bd.*, *supra*, 92 Cal.App.4th at p. 37 (strict scrutiny requires "convincing evidence that race-based remedial action is necessary").

23-902